CASE 85—PETITION EQUITY—JANUARY 6.

# Smith, &c., v. Western Union Telegraph Co.
## Same v. Same.

APPEAL FROM LOUISVILLE CHANCERY COURT.

1. THE DEVICE KNOWN AS A "BUCKET SHOP," which *purports* to be an actual deal in grain, but is *in fact* merely a wager on the market price of the commodity at some specified time in the future, is a species of gambling, and, therefore, illegal.

2. A TELEGRAPH COMPANY can not be required to communicate a message which is to furnish the means of carrying on an illegal business, whatever its motive in refusing to communicate the message.

   In this case the court refuses to require appellee to continue to furnish the appellant, the keeper of a "bucket-shop," with the market quotations.

3. PLEADING.—Defendant having denied that plaintiff was a merchant, or engaged in the grain business, under that denial it was competent to show that appellant was not a dealer in grain, but simply a gambler therein.

EMMET FIELD FOR APPELLANT.

1. The plaintiff is entitled to notice of every defense intended to be relied upon, consisting of any new matter constituting a defense, by a *statement* of such new matter in the answer. (Denton v. Logan, 3 Met., 435; Newman on Pleading, 523; Hunt v. Daniel, 6 J. J. Mar., 404.)

2. The Western Union Telegraph Company must serve the public impartially, and not undertake to adjudicate in its own favor questions of

Smith v. Western Union Telegraph Company.   Same v. Same.

ethics, or public or private morality.   (Western Union Telegraph Co. v. Ferguson, 57 Ind., 495.)

3. The Chicago Board of Trade and the Western Union Telegraph Company have engaged in collecting and selling the market reports, quotations, etc., to all purchasers, until the public has acquired an interest in them, and so long as they continue in that business, they must furnish them to the public.   (Munn v. State of Illinois, 94 U. S., 113; Express Company Cases, 2 Fed. Reporter, 465.)

4. The Western Union Telegraph Company can not make a contract with the Chicago Board of Trade that will prevent it from serving the public impartially.   (American Union Telegraph Company v. The Bell Telephone Company, 10 Central Law Journal, 438.)

5. Contracts for future delivery entered into without any mutual agreement, tacit or express, that they are not to be performed by delivery of the goods and payment of the price, are valid, and no subsequent agreement to settle them by the payment of differences can render them invalid.   (Sawyer, Wallace & Co. v. Taggert, 14 Bush, 727.)

ROZEL WEISSINGER for appellee.

1. The disclaimer of the appellee that it intended to enforce the contract, the entire abandonment of the alleged wrongful intention, entitled appellee to a dissolution of the injunction.   (High on Injunctions, chapter 1, section 22.)

2. Under the denial that plaintiff was a merchant, it was competent to show that he conducted a bucket shop.

3. The chancellor will refuse to compel the defendant to furnish reports to a gambling business, not because it has a right to refuse to furnish them, but because it is against public policy to extend the aid of the court to persons engaged in such business.   (Coppell v. Hall, 7 Wall., 558; Oscanyan v. Arms Co., 103 U. S., 261.)

The case of W. U. T. Co. v. Ferguson, 57 Ind., 495, has been much questioned, and should not be followed.   (Gray's Communication by Telegraph, p. 26.)

4. A. H. Smith, the alleged plaintiff, is not the real party in interest.

5. The proof shows that appellant keeps a bucket shop or a gambling business.   (Bryant v. W. U. T. Co., 17 Fed. Rep., 827; Sawyer v. Taggert, 14 Bush.)

6. The delivery of the reports by the board of trade to the telegraph company, upon the express condition that they shall not be transmitted to bucket shops, and especially to appellant, renders it impossible for appellee to perform the service sought to be required; and a court of equity will not by injunction require a defendant to do an impossible thing.   (Pomeroy on Specific Performance, section 295; 2 High on Injunctions, section 1, 162; 3 Pomeroy's Eq., section 1, 405; Metrop. Grain and Stock Exchange v. Chicago Board of Trade, 15

Smith v. Western Union Telegraph Company. Same v. Same.

Fed. Rep., 847; Marine Grain and Stock Exchange v. W. U. T. Co., 22 Fed. Rep., 23; Todd v. Tel. Co., 17 Hun., 551.)

7. The right of the Board of Trade to dispose of the reports as it pleases is unquestionable. They are property until publicly distributed. (Kiernan v. Manhattan Co., 50 Howard Pr., 195.)

But if it were possible to compel the board to deliver the reports free of all restriction, it could not be compelled in this action, as it is not before the court.

JUDGE BENNETT DELIVERED THE OPINION OF THE COURT.

The appellant brought suit in the Louisville Chancery Court against the appellee, in which he alleged, in substance, that he was the owner and proprietor of the Louisville Cotton, Stock and Provision Exchange; that he was a merchant, and his business consisted in the buying and selling of grain, provisions, and other merchandise; that in order to enable him to carry on his business successfully, and to compete with other persons engaged in similar business, it was absolutely necessary that he should be promptly and constantly informed of the prices of such commodities in the leading markets of Chicago and New York, etc.; that the appellee had, for many years past, combined with its regular business of telegraphing messages for the benefit of the public the business of collecting the market reports in the leading business centers of this country; that the principal market for grain and provisions was the Chicago Board of Trade; that the appellee had, by contract, collected said reports, and delivered and distributed them from the main office of the appellee to the respective offices of its customers by means of its wires and a printing machine called a "ticker;" that, by contract, appellant, as one of appellee's customers, was entitled to the prompt delivery at his business office, by means of said wires and ticker,

of all reports of the market prices of grain, provisions, etc., from the Chicago Board of Trade and other leading business centers, as received by appellee over its wires; that appellee, as such dealer, for the benefit of the public, had no right to refuse to furnish the appellant with said reports, the appellant paying a fair compensation therefor, nor to discriminate against appellant in favor of other customers engaged in similar business; that appellee threatened to cease to furnish appellant with said reports, and to deprive him of the use of said ticker, unless he would sign a contract agreeing to give appellee all of his message business at regular message rates, etc.; that appellant refused to sign said contract with said clause in it, because the same was illegal, etc.

The lower court, in accordance with the prayer of appellant's petition, granted a temporary injunction restraining the appellee from stopping the supply of said reports to the appellant, and from removing said ticker.

By the appellee's answer and amended answer, it denied that appellant was a merchant, or that his business consisted in buying or selling grain, provisions or other merchandise; or that it was then under a contract with the appellant to continue to allow him the use of said ticker, or to furnish him thereby with all market reports.

The evidence tends strongly to show that the appellant, at the time complained of, was not a grain and provision merchant, but was the keeper of a bucket shop, which is described as a place where grain, provisions, etc., are posted on blackboards as they come

in on the ticker. The shop buys or sells indifferently, and always at the price appearing for the time being on the blackboard. Should a customer wish to make a deal in June wheat, say buy one thousand bushels, he sees the last quotation, say one dollar per bushel; he gives the shop the margin, say one cent on the bushel or ten dollars; the shop charges a fixed commission, say one-quarter of a cent per bushel; the shop does not notify the customer of the fluctuations of the market, but he looks out for that on the blackboard. Wheat on the next quotation goes down, say three-quarters of a cent; this loss of three-quarters of a cent, added to one-quarter of a cent charged for commission, makes one cent per bushel on one thousand bushels, or ten dollars. This exhausts or "freezes" out the margin, the deal is closed, and the shop has made ten dollars. On the other hand, should wheat advance one cent per bushel, the customer would make one cent per bushel less one-quarter of a cent per bushel, the commission, and the shop would lose three-quarters of a cent per bushel. It is understood between the customer and the shop that there is no actual deal in grain; that there is none to be delivered, but that the difference in future prices is simply dealt in. In other words, the customer bets the shop that on a certain day in the future, or in a certain month in the future, wheat will be worth so much, and if, at the time agreed, the wheat is worth that much, the customer wins—less the commission; if it is not worth that much, the shop wins. The quotations are used as a basis of this species of betting as a gambler uses dice to decide the bet.

We are satisfied from the proof in the case that ap-

pellant was engaged in this kind of business, and that the contract with the appellee, by which appellant was furnished with the market reports and the use of the "ticker," was necessary to enable the appellant to carry on the business. As we have just said, in this kind of business nothing is actually bought or sold; nor do the parties intend an actual sale of the commodity which they pretend to deal in. They merely wager on the market price of the commodity at some specified time in the future. A mere statement of the character of business done by appellant shows it to be a species of gambling as well defined and as reprehensible as that of keeping a faro bank or a dice machine, and is, therefore, illegal and contrary to public policy.

The question then is, can the appellee avail itself of the fact that appellant was engaged in an illegal business as an excuse for withholding the market reports from him and withdrawing the ticker, both of which were used by appellant in carrying on said business.

Says Justice Shaw, in the case of Fuller v. Dame, 18 Pick., 472: "The law goes further than merely to annul contracts, where the obvious and avowed purpose is to do, or cause the doing, of unlawful acts; it avoids contracts and promises made with a view to place one under wrong influences; those which offer him a temptation to do that which may injuriously affect the rights and interest of third persons."

Justice Grier, in the case of Marshall v. The Baltimore & Ohio R. R. Co., 16 Howard, 334, says: "It is an undoubted principle of law, that it will not lend its aid to enforce a contract to do an act that is illegal, or which is inconsistent with sound morals or public pol-

icy, or which tends to corrupt or contaminate, by improper influences, the integrity of our social or political institutions."

In Watson v. Fletcher, 7 Gratt., 1, it is held that when gaming or wagering is illegal under the statute or common law, the illegality will extend to all antecedent contracts made in aid of or to effectuate the illegal purpose.

These reports were the essence—the very sinew—of appellant's gambling business, and without the prompt supply of which his business was a failure. Can the appellee be compelled to continue the supply? We think not. Not upon the ground that the appellee is the innocent victim of an illegal enterprise; not that it has been entrapped into aiding a gambling business; for it says that it was willing to furnish the reports as long as the terms of the contract suited it, but upon the ground that appellant was engaged in a gambling enterprise, which is contrary to law, good morals and public policy. It is for the sake of the law and the best interest of society that we relieve the appellee from continuing to furnish to appellant the reports.

It is contended, that although the appellant may be engaged in a gambling business, the appellee has no right to withhold the reports from him, because of its position as a public servant, bound to serve the public indiscriminately and without questioning the motives or the purposes of the persons who employ it.

Mr. Gray, in his work on Communication by Telegraph, section 15, says: "The general rule is, that a telegraph company is under no obligation to contract to communicate an illegal or an immoral message."

This rule is not only correct as to telegraph com-
panies, but it applies to all persons who undertake to
carry for the public.  A contrary rule would convert
a telegraph company into a public vehicle for the pur-
pose of communicating unlawful, treasonable or felo-
nious schemes of all kinds, or the consummation of any
and all kinds of illegal transactions and enterprises.
Of course, a telegraph company, in assuming to refuse
to send a message because it is illegal or immoral, acts
upon its peril.  If it is mistaken, or has misjudged the
tenor or purpose of the message, it would be held re-
sponsible to the injured party for any damage sus-
tained by reason of the refusal.

It is contended, that inasmuch as the appellee failed
to plead that appellant was engaged in an illegal busi-
ness, that question can not be considered.

The appellee did deny that appellant was a merchant
or that he was engaged in the grain business, etc.  Un-
der that denial, it was competent for the appellee to
show that appellant was not a dealer in grain, but sim-
ply a gambler therein.

The judgment of the lower court dissolving the in-
junction and dismissing the petition is affirmed.