GRAY *v.* THE WESTERN UNION TELEGRAPH COMPANY.

After receiving a telegram for transmission and accepting payment for the same, the company cannot defend an action for the statutory penalty incurred by failure to deliver it with due promptness, on the ground that the contents of the telegram related to a sale of futures, and consequently to an illegal transaction.

July 8, 1891. By two Justices. Argued at the last term.

Penalties. Telegraph message. Futures. Before Judge MILLER. Houston superior court. April term, 1890.

Reported in the decision.

HARDEMAN, DAVIS & TURNER and W. C. WINSLOW, for plaintiff.

GUSTIN, GUERRY & HALL, for defendant.

BLECKLEY, Chief Justice.

That the United States mail might lawfully carry either a sealed letter or an open circular from Fort Valley to Macon, though the contents of the document related to the purchase and sale of futures, is certain. Equally certain is it that a common carrier between these points might innocently transport a passenger whose known business was to make a trip for the exclusive purpose of buying or selling futures, or might carry and deliver a bundle of stationery intended by the consignee for use in his business as a dealer in futures. In each of these cases, the object sought to be subserved by the writer, the passenger or the consignee would simply be irrelevant. To consider it would be to introduce moral distinctions not pertinent to the function

which the mail or the carrier was designed to perform. In like manner, under the statute on which the present action is founded, the moral purpose of a telegram is immaterial, provided it is not designed to prompt or promote the commission of a crime or a tort. Telegraph companies, like common carriers, are voluntary servants of the general public. They exercise a public employment, and offer themselves for the transaction of business in behalf of every person who seeks to engage their skill and their special facilities for a peculiar class of work. Their relation to the public imposes upon them the duty of undertaking as well as the duty of performing, and the violation of either duty is a misfeasance, a tort. It is the equivalent, therefore, of an affirmative interference by a mere private person to hinder or obstruct communication. For one of these companies not to receive or not to transmit and deliver a dispatch when it ought to do so, is more than a refusal to contract or than the breach of a contract; it is a wrong as pronounced as would be that of a person who should forcibly exclude another from the telegraph office and prevent him from handing in a dispatch which he desired to lodge for transmission. In dealing with the wrong as such, the element of contract is not involved. Why should this company not have transmitted and delivered the reply which the plaintiff sent to his correspondent in answer to a dispatch from the latter which the company had brought to him by telegraph? The dispatch was, "Shall I draw for more *bonus?* Answer quick." The reply was, "If necessary, draw for more *bonus.*" It is admitted that the subject of this correspondence was a transaction in futures, a species of gambling of the worst description, and it is on this ground that the failure of the company is sought to be justified. But the statute which we are considering makes by its letter no exception; it declares that

every company of this description "shall, during the usual office hours, receive dispatches, whether from other telegraphic lines or from individuals; and on payment or tender of the usual charge, according to the regulations of such company, shall transmit and deliver the same with impartiality and good faith, and with due diligence, under penalty of $100," etc.   Acts 1887, p. 111.   In construing and administering the statute, what exceptions can the courts make by implication? Doubtless, a dispatch to be entitled to transmission must be free from open indecency or profanity, and perhaps other vices of language might condemn it, but supposing it to be proper in tone and expression, we should say that the company would have no concern with its import unless it sought to subserve either crime or tort.   If it disclosed either of these objects, it seems to us that the company, for its own protection, might and should refuse to handle it.   It would be unreasonable to suppose that the legislature intended telegraph companies to aid in the perpetration of crimes or actionable wrongs, for this would be to constrain them to do by legislative mandate what they would have no right to do by their own choice.   But, on the other hand, any dispatch which a company could lawfully transmit by its own choice, the statute obliges it to transmit and deliver.   The power of voluntary selection is denied, for every company is required to transmit and deliver "with impartiality and good faith."   A dispatch cannot be rejected on account of its subject-matter, unless by sending it the company would or might subject itself or its servants either to indictment or a civil action. This is a rational test, and one that may fairly be presumed to coincide with legislative intention.   If before the statute was enacted, a telegraph company could at its own will serve one customer and decline to serve another, the dispatches of the two being exactly similar, this

option no longer exists. All customers are now to be treated alike. If one can correspond by telegraph touching his speculations in futures, all may do so. There can be no discrimination, no favoritism. The company cannot waive morality for one, and stand on it against another. Now, in this State it is neither a crime nor a tort to speculate in futures. It is gross immorality, and conflicts with public policy, but it is not indictable nor actionable. On the contrary, by a recent statute dealers are recognized and tolerated on condition of registering themselves and paying a fixed tax. Acts 1888, p. 22. It was certainly the legal right of the company to transmit and deliver the dispatch sent by the plaintiff if it had elected to do so. It would have incurred no penalty, subjected itself to no action or indictment. Moreover, it actually undertook to do it, and received pay for the service. And it had already transmitted and delivered the dispatch to which this was a reply. Why serve one of the parties and not the other? But we hold that it was bound to serve both, for the reason that the law leaves it free to serve them. Where there is such a statute as we are construing, it cannot be a matter of option to obey or disobey. On the contrary, unless some other law forbids what the letter of the statute commands, the letter must prevail. In adjudicating upon a like statute, the Supreme Court of Indiana, in W. U. Tel. Co. v. Ferguson, 57 Ind. 495, held that the company, when sued for the penalty incurred by failing and refusing to transmit a dispatch expressed in these terms: "Send me four girls, on first train to Francisville, to tend fair," could not defend by setting up that the dispatch was ambiguous and that on account of certain extrinsic facts the company had reasonable cause to believe and did believe that the girls wanted were prostitutes, and that the object of the message was to draw prostitutes to the fair. It seems to

us that this decision was correct. It did not appear that the company or its servants would have been subject either to indictment or to action if the girls called for had been sent and had attended the fair. When a dispatch is ambiguous, the law would give the benefit of the ambiguity to the company in dealing with it either civilly or criminally for transmitting the dispatch, and hence, it would be the duty of the company, in deciding whether to transmit or not, to give the benefit of the doubt to the sender. On no other rule would it be practicable for telegraph companies to perform their legitimate functions as servants of the general public. They could not wait to question and investigate the motives of those who offer ambiguous dispatches for transmission. Indeed, in this State they are required by the same statute we are now discussing to forward dispatches written in cipher, and this enables the sender not only to conceal his motives partially but to conceal them altogether. This may serve to suggest how little the company is concerned with unlawful or improper motives, unless they are plainly disclosed on the face of the dispatch.

The cases of Bryant *v.* W. U. Tel. Co., 17 Fed. Rep. 825, and Smith *v.* The Same, 84 Ky. 664, 2 S. W. Rep. 483, were not ruled upon any statute, but upon principles of general law. Doubtless it is true that a telegraph company is not bound, even when it contracts to do so, to furnish to "bucket shops" reports of the market prices of stocks and provisions, nor to allow "tickers" for the purpose to remain in the offices of these immoral establishments. But were the supplying of market reports and "tickers" for all applicants, "with impartiality and good faith," enjoined by statute, a different question, and one more germane to the present case, might arise. The Sunday messages adjudicated upon in some of the cases are also without relevancy, for the statute does not purport to prescribe duties ex-

cept as to dispatches offered "during the usual office hours," meaning, of course, legal office hours. So far as we are aware, no decision of any court is to be found which holds it illegal for a telegraph company to receive and transmit messages relating to speculative transactions in futures, where that class of business has not been made penal by statute. That damages for the breach of a contract to correctly transmit a message of that nature, cannot be measured by the results of such dealings, was decided in *Cothran* v. *W. U. Tel. Co.*, 83 *Ga.* 25, but there is no suggestion in that decision that the broken contract was unlawful. On the contrary, this language will be found in the opinion : "We think this standard cannot be invoked, for the reason that contracts relating to 'futures' are illegal, and we see not how an illegal contract can be called in to measure the damages sustained by reason of the breach of a legal contract." There may be strong reasons of public policy why legislation ought to prohibit all dealings in futures, and all communication by telegraph tending to foster or facilitate such dealings, but in the present state of the law, no matter how reluctant telegraph companies may be to transmit and deliver messages of this class, especially if their reluctance arises after they have accepted pay for doing it, they have no option but to perform the service or pay the penalty.                                *Judgment reversed.*