46 So.2d 458 (1950)
McINERNEY et al.
v.
ERVIN, Attorney General, et al.
Supreme Court of Florida, en Banc.
March 21, 1950.
*459 Pat Whitaker, Tampa, and Vincent C. Giblin, Miami, for appellants.
Lewis W. Petteway, Tallahassee, D. Fred McMullen, Tampa, Guyte P. McCord, Jr., Tallahassee, Richard W. Ervin, Attorney General, George M. Powell, Howard S. Bailey, Reeves Bowen and Fred M. Burns, Assistant Attorneys General, for appellees.
TERRELL, Justice.
The legislature of 1949 enacted Chapter 25016, F.S.A. § 365.01 et seq., regulating the lease and use of private wires by public utility companies. Sections two and three of said act are as follows:
"Section 2. It shall be unlawful for any public utility knowingly to furnish to any person any private wire for use or intended for use in the dissemination of information in furtherance of gambling or for gambling purposes, or for any person knowingly to use any private wire in the dissemination of information in furtherance of gambling or for gambling purposes."
"Section 3. The use of any private wire for use in the dissemination of information in furtherance of gambling or for gambling purposes is hereby declared to be a public nuisance and subject to abatement as provided for in Section 64.11, 64.15, both inclusive, Florida Statutes, 1941, but this remedy of injunction shall be in addition to and not in lieu of any remedy provided by this Act or otherwise provided for by law."
May 18, 1949, appellants filed their bill for declaratory decree, naming the Attorney General and Florida Railroad and Public Utilities Commission as defendants. The bill prayed, (1) That the Court decree said act to be unconstitutional and void because of conflict with applicable provisions of the State and Federal Constitutions. (2) In the event the Court does not *460 see fit to decree said act to be unconstitutional and void in toto, then it construe the words in "furtherance of gambling" including other provisions of the act so as not to make unlawful the dissemination of information by complainants which may be used by the recipient to facilitate illegal gambling transactions, or that the rights, status or business of the plaintiffs be not affected by said act. The bill also prayed for injunction to forestall enforcement of the act until its validity could be determined. A motion by defendants to dismiss the bill was granted and the plaintiffs appealed.
Appellants urge ten questions for adjudication. Question one has to do with whether or not this is such a case as may be comprehended under the declaratory decree Statute, Chapter 87, F.S.A. In conjunction with this question there is also presented the question of whether or not this is a suit against the State, condemned by Section 22, Article III of the State Constitution, F.S.A.
A casual reading of Chapter 87, F.S.A. necessitates an affirmative answer to the first phase of this question. See also Ready v. Safeway Rock Co., 157 Fla. 27, 24 So.2d 808, in which the scope and purpose of Chapter 87 was discussed. As to the second phase of this question, a negative answer is equally as impelling. Curry v. Woodstock Slag Corporation, 242 Ala. 379, 6 So.2d 479; State v. Louis Pizitz Dry Goods Co., 243 Ala. 629, 11 So.2d 342; Work v. State of Louisiana, 269 U.S. 250, 46 S.Ct. 92, 70 L.Ed. 259; Harrington v. Cobb, Tex.Civ.App., 185 S.W.2d 133; Cobb v. Harrington, 144 Tex. 360, 190 S.W.2d 709, 172 A.L.R. 837.
Further supporting the answer to both these questions the logic of Mr. Borchard in his excellent treatise on Declaratory Judgments, Second Edition, page 876 is pertinent. "The avalanche of legislative and administrative decree which characterizes modern government has brought in its train an increasing number of commissions and officials whose powers, as they affect private activity, are a constant source of objection, doubt, debate, and dispute. For the more speedy and convenient settlement of differences, administrative tribunals in growing number have been established, for under a constitutional government the jurisdiction and powers of official bodies are always a subject of judicial challenge and review. Hence the constitutionality of statutes and ordinances and the validity and legality of an administrative action thereunder are a constant subject of litigation."
It is now generally recognized that the citizen should have the most inexpensive, speedy and expeditious method possible to raise the myriad of questions that arise under the statutes and administrative acts. The Declaratory Judgments Act not only enables the citizen to do this, but it enables the government to raise questions that beset it in its dealings with the citizen. Whether the question is raised by the citizen or the government through its properly constituted officers, it is not a suit against the State prohibited by the State Constitution.
So much for the secondary question in the case. The dominant or key question is whether or not Chapter 25016, Acts of 1949, can be upheld as a valid police regulation, despite the limitation on state legislative power by the commerce clause of Federal Constitution. Article 1, Section 8, Clause 3, the applicable part of which is, "to regulate Commerce, with foreign Nations, and among the several States."
Appellants contend that this question requires a negative answer. They support this premise with the thesis (1) That Congress has preempted the field of interstate and foreign communications by the enactment of the Federal Communications Act of 1934, 47 U.S.C.A. § 151 et seq., and having done so, it is not a subject on which the State can legislate. (2) That the State under its police power is without authority to impose such a burden as Chapter 25016 imposes on interstate commerce. (3) That appellants are engaged in the business of gathering and transmitting, in interstate commerce, harmless information that cannot be prohibited by State or Federal law. (4) Under the guise of its police power, the State is powerless to erect a barrier at the *461 State line, so as to exclude the transmission of harmless information by radio, telephone or telegraph messages which it may determine is used for immoral purposes. (5) The State is without power to discriminate between appellants and newspapers of general circulation which are engaged in gathering and disseminating the same type of information. (6) Appellants have no interest whatever in the use of the information gathered and distributed by them and should not be held criminally liable for the use its subscribers make of it, even though they may use it for immoral purposes.
Sections 2 and 3, Chapter 25016, as quoted in the forepart of this opinion, make it unlawful for a public utility to furnish any one a private wire for use in the dissemination of information for gambling or for gambling purposes. Both sections 2 and 3 condemn the use of any private wire for the disseminating of gambling information. Other provisions of the act require any public utility which leases a private wire to any customer, to furnish the Florida Railroad and Public Utilities Commission duplicate copies of its contract for furnishing such service. The act also provides that said contracts constitute prima facie evidence that the private wire is used for gambling purposes. It is further provided that in any proceeding before the Railroad and Public Utilities Commission, affecting the cancellation of said service, the burden of proof shall be on the person contracting for the private wire to show that it has not been used, nor is it intended to be used, for gambling purposes. There are other provisions and qualifications in the act which are not necessary to recite or refer to here.
By its very terms, Section 15 of Chapter 25016 is "an exercise of the police power of the State of Florida for the protection of the * * * people of the State of Florida". It is hardly necessary to point out that the legislature has power to single out, condemn and punish such acts as it deems injurious to public morals. If furnishing information about horse racing or bookmaking fall in that category, it may resort to such means as are reasonable and within constitutional limitations to suppress it. It may also employ such means and instrumentalities as are necessary to cope with and subdue any moral evil. Human ingenuity to outwit and suppress crime should certainly keep pace with the ingenuity of those who would devise and commit it.
It follows that the legislature was well within its power in providing that contracts for private wire service under conditions stated, constitute prima facie evidence that it is used for gambling purposes. It was also within its power in imposing the burden on the contractor for the wire service to show that it was not, nor was it intended, to be used for gambling purposes. The legislature has always been permitted to impose more severe methods to suppress moral evils than it has other evils. We are convinced that these and other provisions of Chapter 25016 do not run counter to the commerce clause of the Federal Constitution. It may be that other effective means could have been employed, but this was a matter for legislative determination.
The cases are legion in which the Supreme Court of the United States and the State Supreme Courts have adjudicated points similar to that involved in this case. The net result of these holdings is that there is no hard and fast rule to determine when a State Statute lays an undue burden on interstate commerce in violation of the Federal Constitution. Every case must turn on its peculiar facts. These facts must answer the question, whether or not Congress has entered the field, and if it has not, does the State regulation disrupt lines of communication essential to uniformity. If Congress has not entered the field, the States may feel free to do so, and even when Congress has entered the field, if the State regulation does not disrupt or interfere with lines of communication where uniformity is essential, the State regulation will not be held unduly burdensome.
The law is settled in this country that the commerce clause was not intended to inhibit the States from promulgating and enforcing police regulations even though such acts may incidently or indirectly affect interstate commerce. Boston & Maine Railroad Co. v. Armburg, 285 U.S. 234, 52 S.Ct. 336, 76 L.Ed. 729; Freeman v. Hewit, *462 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265; United States v. E.C. Knight & Co., 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325; State v. Appley, 207 S.C. 284, 35 S.E.2d 835, 162 A.L.R. 1184; Edwards v. California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119; State v. Stripling, 113 Ala. 120, 21 So. 409, 36 L.R.A. 81; City of Louisville v. Alvy et al., 116 Ky. 812, 76 S.W. 876, 79 S.W. 201; Fleming v. Wengler, 269 Mo. 366, 190 S.W. 875; Gundling v. Chicago, 177 U.S. 183, 20 S.Ct. 633, 44 L.Ed. 725.
Many other state and Federal cases could appropriately be added to this list. They are predicated on the generally accepted ground that the State is the primary judge of, and may, by statute or other appropriate means, regulate any enterprise, trade, occupation or profession if necessary to protect the public health, welfare or morals. The case of Sligh v. Kirkwood, 237 U.S. 52, 35 S.Ct. 501, 59 L.Ed. 835, might be held to conclude the case at bar. This was a Florida case, very similar in some aspects to this case. The Court held unequivocally, that the State had power to prescribe and enforce regulations to prevent the production of impure foods within its borders, that such articles were not the legitimate subject of trade or commerce, nor could the exercise of State power to destroy them be considered as the regulation of commerce, prohibited by the Federal Constitution.
In the case at bar it is shown that the leased wires brought in question were used by appellants to transmit information about horse racing, prize fights, football games, baseball games and other sporting events from Baltimore and New Orleans to Miami and other places in Florida. It may be admitted that these messages are of interstate character, but it does not follow that when the information conveyed is used to bet on a horse race it becomes an article of interstate commerce as contemplated by the Federal Constitution. In fact, when the information is released for the purpose of wagering, it may then be like the articles in a package when broken, they forfeit their interstate character and are subject to state regulation.
At any rate, if deleterious fruit is not the subject of interstate commerce, gambling information could not be said to be so. No question of destroying lines of communication where uniformity of operation is required is before us, and no general burden on interstate commerce is shown to be brought in question. Chapter 25016 not only imposes the prohibition on the utility furnishing the private wire, but it also punishes the person who knowingly uses the private wire to disseminate information for gambling purposes. Some of the courts have held that in the absence of statute, or authorized regulation, the utility furnishing telegraph information that is used for gambling purposes may terminate the service at pleasure and their action will be upheld. Parkes v. Bartlett, 236 Mich. 460, 210 N.W. 492, 47 A.L.R. 1128 and 1135; Smith v. Western Union Telegraph Co., 84 Ky. 664, 2 S.W. 483.
Appellants contend that the Federal Communications Act of 1934, 47 U.S.C.A. § 151 et seq., is now the sole criterion governing this question and that it forecloses the point contrary to the contention of appellees. It is true that the latter act governs all interstate communications by wire and radio. These communications by wire had previously been under the control of the Interstate Commerce Commission, but there is nothing in the Federal Communications Act to indicate that it was in any way intended to trench on the police power of the states and no regulation of the Federal Communications Commission is shown to deal with the subject matter of this litigation. The Federal cases support this premise. Cloverleaf Butter Company v. Patterson, 315 U.S. 148, 62 S.Ct. 491, 86 L.Ed. 754; McBride v. Western Union Telegraph Co., 2 Cir., 171 F.2d 1; Id., D.C., 78 F. Supp. 446.
In so holding we do not overlook the contention of appellants that they are engaged in the business of gathering and distributing harmless information and have no interest in its use after delivery. This may be admitted, but the answer is that the authority set up by the legislature has found that it is being used for a purpose condemned *463 by the act drawn in question. The legislature employed this means to subdue an immoral practice and we are not authorized to strike it down because we think another course should have been adopted. The predicate for invoking the police power is that the public welfare requires the regulation proposed and that it may be reasonably expected to correct the evil proscribed.
The difference between the private wire service banned by Chapter 25016 and the service of similar character furnished by newspapers, and other periodicals, is mainly one of speed and organization whereby the information secured can be placed in the hands of the purchaser and used for gambling purposes before it is published and becomes public property. Except for this element bookmaking of the "bookie" business would not be profitable and doubtless would not exist. It is this element that makes betting on horse racing and other sporting events pay off. It is not for this Court to say that the purpose of Chapter 25016 was to outlaw bookie betting and channel horse race gambling through the pari-mutuel system which is legalized in this State.
The ramifications of modern economic and social conditions have enlarged the conditions under which the police power may be exercised for the purpose of suppressing practices that are repugnant to the morals, health and welfare of the country. To contend that the interstate commerce clause or any other attribute of government inhibits this is wide the mark. The police power was born with and is a necessary concomitant of civilized government. It is an essential of sovereignty and was possessed by every state before the union was formed. It has been many times held that the constitution concedes the pre-existance of the police power. While no limitations have circumscribed its use, and it is not susceptible of satisfactory definition, the very existance of government depends on it. It has been held to be the very essence of government and that all other powers are incidental to it. It stems from the maxim, sic utere tuo ut alienum non leadas (use your own property in such a manner as not to injure that of another). Blackstone attempted to define it before the Revolution and supported his theory of it by the maxim, salus populi est suprema lex (the welfare of the people is the supreme law). American Jurisprudence, Vol. 11, page 966 et seq.
Appellants underestimate the place of the police power in our scheme of government. It was inherent in the people long before the constitution was promulgated and the makers of the constitution declined to meddle with it. It was recognized as a power outside the constitution limited by the concept of common sense and reason. It was one of the powers reserved to the States by Article 10 of the Federal Constitution. The Federal Government has no general police power and that of the states is beyond the reach of Congress, except in rare cases where the people in whom it inheres have released it by the terms of the Federal Constitution. It is in constant state of evolution in order that it meet the calls for its exercise to secure the peace, welfare, good order, health and morals of the people. Hence it can under no circumstances be surrendered by the States. When it is assaulted for being in conflict with any provision of the Federal Constitution the assault should be resolved to harmonize with democratic profession. As to the effect of the interstate commerce clause on it, the cases reveal that a state regulation will not be overthrown by it unless it is shown to disrupt lines of communication essential to uniformity. The dissemination of information enabling one to bet on a horse race or some other sporting event does not reach this dignity. It is in essence a domestic regulation, within the inherent power of the states and will be stricken down only when shown to be arbitrary and unreasonable.
Other questions urged have been considered but in view of the foregoing, it becomes unnecessary to discuss them, so the judgment appealed from is affirmed.
Affirmed.
ADAMS, C.J., CHAPMAN, THOMAS and HOBSON, JJ., and REGISTER and FABISINSKI, Associate Justices, concur.