## FOGARTY v. SOUTHERN BELL TELEPHONE & TELEGRAPH CO., Inc.

No. 331.

District Court, E. D. Louisiana, New Orleans Division.

Aug. 14, 1940.

T. Semmes Walmsley, of New Orleans, La., for plaintiff.

J. C. Henriques and Henriques & Mayo, all of New Orleans, La., for defendant.

CAILLOUET, District Judge.

John J. Fogarty filed his petition in the Civil District Court for the Parish of Orleans, praying:

1. For a temporary restraining order against the Southern Bell Telephone and Telegraph Company, Inc., its officers, agents, servants and employees, from in any manner interfering with, or preventing him from receiving the telephone service that he had been theretofore receiving through utilities furnished by the said company, etc.;

2. For a preliminary injunction enjoining, restraining, and prohibiting the said company and persons from in any manner interfering with or preventing him from receiving and securing said service, etc.;

3. For judgment recognizing petitioner's right to receive the said telephone service, and for a permanent injunction perpetuating the preliminary injunction in question, etc.

The petitioner specifically alleges that he "is engaged in the business of publishing and selling a newspaper which disseminates sports news to subscribers therefor, and in connection therewith he renders a daily service to his subscribers by giving free and up-to-date last-minute news to all of his subscribers."

He further alleges that the telephone service furnished by the defendant company is used, for both local and long distance "calls, for gathering and disseminating news and information for petitioner, and is an indispensable part of his business, and is necessary to the publication of his newspaper."

His petition then continues to the effect that the Southern Bell Telephone and Telegraph Company, Inc., is a public utility, which is required by law to furnish service in the New Orleans commercial area to subscribers who are "conducting lawful enterprises, such as conducted by petitioner", where the subscribers have paid for such service, as he, himself, has.

He then alleges that the defendant company has notified him that all of the telephone service, so duly paid for by him, will be discontinued by a certain date, and that such threatened discontinuance, if put into effect, (a) "will disrupt, interfere with, and completely stop the business which your petitioner is engaged in and prevent his publishing the news, as he has no other means of acquiring and promptly disseminating the information gathered through the present means of telephone;" (b) will constitute a breach of his contract for service with said defendant company; (c) will deprive petitioner of his means of livelihood, and will, therefore, deprive him of his property without due process of law.

The petition then furthermore alleges that the "interference with plaintiff's business is an interference with and abridges the rights of the freedom of the press in securing and publishing its news."

In addition to all of the foregoing, the petitioner then alleges that, as an inducement to subscribe for his publication, held out by him to many persons "in New Orleans and the vicinity", he gives them "free of cost, a news service whereby he keeps them informed upon their calling him on any sport news that occur during the day," and that discontinuance of his said paid-for telephone service "will interfere with the carrying out of his contract and will impair his obligation with your petitioner's subscribers".

Threatened irreparable injury and lack of adequate remedy at law to protect himself against such injury is finally alleged.

A restraining order, coupled with the usual rule to show cause why a preliminary injunction should not issue, was granted by the State court upon the faith of said petition and the plaintiff's thereto subjoined affidavit, specifically setting forth as follows: "Your proponent further declares that he does publish a newspaper and furnish to his subscribers a news service in the City of New Orleans; that he gathers his news by means of the telephone herein subscribed for in connection with the news published in said publication; that in order to keep his subscribers supplied with up-to-date last minute sports information, he corrects any news contained in said publication with any last minute changes that may occur during the course of the day; and that said news service is therefore a current news service in which said telephones are an indispensable part; that he is under contract to deliver the information secured and disseminated by him through his publication; that if he is not permitted to receive said information by telephone same will interfere with his contractual obligations and

that if said telephones are discontinued his publication will be forced to stop and that same 'will disrupt his entire work and he will have no means of securing said data, or disseminating the up-to-date, last minute news, thereby interfering with the freedom of the press; that your affiant has no remedy at law, and that his loss will be irreparable unless an immediate temporary restraining order issue."

The petition for removal from the State court to this court next followed, before the arrival of the return day set in the rule nisi, and, in due course (the removal being effected on the ground of diversity of citizenship), the case was tried directly on the merits before *this* court (by agreement of the parties) upon the answer filed by the defendant company, which specifically denied that petitioner Fogarty is engaged "in the business of publishing and selling a newspaper which disseminates sports news to subscribers therefor, etc."

The answer then charged that, in truth or in fact, Fogarty publishes,—not a "newspaper" but a mere race scratch sheet—and is engaged in distributing and disseminating, by means thereof, as well as by and through defendant's telephone service, to various and sundry places "outside the enclosure of a licensed race-track", information pertaining to race-tracks, race-horses, betting odds, forms, charts, etc.; all, in violation of the law of the State of Louisiana.

Additionally, by way of further answer, the defendant company alleged as follows:

"Defendant asserts that it is a part of what is commonly known as the Bell System, which system is comprised of the American Telephone and Telegraph Company and its associated companies; the constituent companies thereof, by means of and on their respective facilities and connections therefor and with the connecting companies furnish intrastate as well as interstate wire communications service throughout the United States.

"Defendant further shows that prior to the notice of its intention to discontinue the service of Petitioner, it and wire companies in general were advised and warned by the Attorney General of the United States and other federal officers, by statements issued to the press and by and through correspondence between the Illinois Bell Telephone Company and the American Telephone and Telegraph Company, on one hand, and the said federal officers on the other hand, all of which statements and correspondence Defendant had knowledge of, that by rendering service to persons engaged in the business in which Petitioner is engaged, Defendant would violate the laws of the United States and would cause itself to be subjected to criminal indictment and prosecution in the courts of the United States. Defendant avers that it does not hold itself out to serve, and cannot be compelled to serve, every person, firm, or corporation, if by giving such service it would or might subject itself or its employees to indictment or prosecution for the violation of the laws of the United States.

"Defendant, therefore, asserts that it was and is reasonably apprehensive that to continue to furnish the service to Petitioner which is described in the petition would or might subject Defendant or its employees to criminal indictment and prosecution for violation of the laws of the United States, and that by reason thereof Defendant was and is lawfully authorized to discontinue said service to Petitioner."

On the trial, plaintiff Fogarty testified that his business is that of "publishing sports papers", and of furnishing information to some 10 "news agencies" in the South.

The "papers" that he publishes are:

1. The "early or afternoon entry edition", which (as P–1) is before the court, and sells for 15 cents, is a 3-sheet (8-½ x 14) mimeographed document setting out the overnight race track entries, the weather and track conditions, the jockeys, their respective weights, and the results of races on the preceding day, with scratches, payoffs, etc.; the average daily "circulation" of this scratch sheet is about 3,000.

As "space-fillers" on one such "morning edition" before the court (P–1), appear scattered baseball results; this "news" occupies but a bare 1% (more or less) of the mimeographed space;

2–the "morning edition", which is before the court as "P–2", sells for 35 cents, and has a daily circulation of between 4,000 to 4,500; this exhibit, also, is a 3-sheet (8-½ x 14) mimeographed document, and it sets out the condition of the weather and of the operating tracks, the respective races covered, the entries, jockies, weights, odds, scratches,—no other "news"; and

3–the printed "Crescent City News" (which is before the court as "P–3"), with

a circulation of 1,000 to 1,500; *that*, plaintiff Fogarty calls his "daily newspaper". It is a 4-sheet (11-¼" x 15") paper, over three-fifths of whose news is such as pertains to horse racing, of a similar nature as the news carried in the two scratch sheets "P–1" and "P–2".

To gather the "racing news" material, so appearing in his said publications (which his petition refers to as his *one* newspaper) and to furnish, as plaintiff represents, "a daily service to his subscribers by giving free and up-to-date last minute news to all of his subscribers", plaintiff Fogarty maintains 94 telephones at 803–804 Carondelet Building, in the City of New Orleans, and 29 telephones at the Wells-Fargo Building. Four of the 94 are special long distance phones, over which no local service is had from the telephone company. Two of the 94 (both locals) are in plaintiff's private office, the remaining 92 (all upright,—not French type phones) are pyramided 3, 2, and 1, and are answered by 13 employees.

The 29 phones in the Wells-Fargo Building are used only in emergencies.

All of these phones (or practically so) were in use before November 15, 1939, which was the day upon which plaintiff Fogarty ceased to be the manager of Nationwide News Service; it went out of business on or about that date, and he succeeded it.

The greater number of these phones had all been subscribed for by him, under fictitious names, such as Merlin Shrimp Company, Houma Linen Company, Pelton Termite Company, Baxter Flour Company, Poydras Iron Works, J. T. Tile Company, Morgan Soap Company, Acme Housecleaning Company, etc. Twenty-one of the 94 in the Carondelet Building, and 15 of the 29 in the Wells-Fargo Building, stood in the names of Frank Mulkern, or A. Lupo, respectively, both of whom had been also employed by the Nationwide News Service and both of whom continued in plaintiff's employ when said Nationwide News Service discontinued business and was succeeded by plaintiff.

The phones were so subscribed for because (so plaintiff Fogarty testified) the telephone company refused to service the Nationwide News Service and suggested the taking out of the service contracts in that way; the company required affidavits to the effect that the desired service would not be used for illegal purposes, said the witness; apparently (the witness sought to leave the impression) the telephone company was not disposed to *openly* service the Nationwide News Service, because of its known illegality.

The difference between *that* business and his own (by which it was succeeded), so contended plaintiff Fogarty on the stand, lay in this, to-wit: the Nationwide News Service had no publications like his; it "got out no advertisement", whilst (he said) he does; it called up its subscribers to furnish them "racing service", and (he said) he does not—the subscribers call him up.

Fogarty's "subscribers" to his two scratch sheets and his one "newspaper" pay no subscription price, but each week the "subscribers" purchase and pay for as many scratch sheets or "newspapers" as they elect. No records of such weekly purchases are kept, but the plaintiff agreed to furnish and file in the record (in connection with his testimony on cross-examination) a list of his "subscribers", with amounts paid, for the week next immediately preceding that of the trial. This he did do, and such list shows him to have had, for that week, 61 "subscribers", who paid him sums ranging from the minimum of $10 to the maximum one of $400, respectively, for an aggregate weekly income of $4,500.

These "subscribers", so plaintiff's testimony indicates, were all former "subscribers" of the defunct Nationwide News Service, of which he had been the manager. When he "took over" on November 15, 1939, he began the publishing of his "sheets" and sent them to said former "subscribers" regularly. He did not solicit their "business"—they, on the contrary, came to him.

Plaintiff's testimony is that the larger portion of his business is "horseracing", and that were it not for *that*, he would not have need of the extraordinary service equipment of 94 *active* telephones and the reserve emergency force of 29 additional, the service and toll charges as to which cost him during April, 1940, approximately $5,000; and for which the defendant telephone company yearly collects from him an aggregate sum exceeding $25,000.

By means of his four special long distance phones, the plaintiff gathers his racing news from the country's race tracks and then disseminates the same from and through his telephone equipment in New Orleans to his "subscribers", practically all of whom are to be found in the City or within its immediate vicinity; for instance,

no more than 7 of his 61 "subscribers" for the week ending May 6, 1940, being located beyond the borders of the State of Louisiana.

Dissemination of this "phone-gathered" racing news also takes place by means of plaintiff's two scratch sheets and his one "newspaper", but these "publications" are plainly but the subterfuge "difference" in the operation of the race news dissemination system conducted by Fogarty, owner, and the former one of Nationwide News Service, of which he had charge as manager.

The plaintiff insists that the phone service which the defendant company threatens to discontinuue is an absolute necessity for the continued conduct of his business, "the biggest portion" of which, he testified, is "horseracing".

He gives racing news over the phone to restaurants, saloons,—to anyone; it makes no difference to him who calls for such information over the phone, whether it be a handbook operator or not. He "guesses" that such "handbooks" do so seek such information from him, but (so he says), he doesn't "know positively" that they do.

Of his "subscribers", the one of them who was called to the stand by the defendant company admitted that he "booked racehorses" and was a "subscriber" to plaintiff Fogarty's "scratch sheets", for which he paid between $90 and $125 per week; he secured, he said, the needed information for the carrying on of his "book business" from these scratch sheets, as well as orally, by telephone service from the Fogarty establishment. He has a particular phone call number assignment, the evidence in this connection being that nearly all (if not all) of the 121 telephones rented by plaintiff Fogarty are not listed in the telephone directory. When he, the witness Jules Rimbolt, calls the Fogarty establishment, he secures, for instance, the race results on a particular track and is informed as to the "pay-off", which thereupon governs his own pay-off of the racing bets in his "book".

The defendant company offered satisfactory and sufficient evidence in support of its contention that it has reasonable grounds to suspect the illegality of the plaintiff's "improved" system of disseminating race track news, but plaintiff insists that the operation of his system does not violate any law.

He contends that Act No. 13 of the 1934 2nd Extraordinary Session of the Louisiana Legislature (which amended and re-enacted Act No. 26 of the 1934 1st Extraordinary Session) and which *first* makes it "* * * unlawful for any person or persons, firm, or corporation whatsoever to distribute, disseminate, make known, advise, or spread, or otherwise, by means of telephone, telegraph, radio, or in any other manner make known to pool rooms, bar rooms, saloons, restaurants, gambling houses, or any other place outside the enclosure of a licensed race-track, any information of whatever kind, pertaining to any race, race-track, race horse, betting or betting odds, form charts, or any information relative or incidental thereto," and then provides as follows, to-wit: "* * * the provisions of this Act shall not apply to any newspaper published daily and consecutively for one year prior to the adoption of this Act. Any newspaper published daily and consecutively for one year prior to the adoption of this Act may receive by telephone, or telegraph, or otherwise, and may distribute, disseminate, make known, or spread, through its columns, any and all information pertaining to any race track, race, race horse, betting odds, form charts, or any information relative thereto," either does not apply to him or is unconstitutional.

It is unconstitutional, the plea filed by him on the trial urges, because:

"(a) It is in violation of the Fourteenth Amendment of the Constitution of the United States because it denies your petitioner the equal protection of the laws guaranteed to him.

"(b) That said act is an unwarranted and unlawful interference with interstate commerce.

"(c) That said act violates the First Amendment of the Constitution of the United States and Article 1 Section 3 of the Constitution of the State of Louisiana by curtailing or restraining the liberty of speech and of the press.

"(d) That said act is discriminatory and deprives your petitioner of rights granted to others.

"(e) That said act is not general in its scope and grants special privileges denied to your petitioner."

The plaintiff makes out no case for the interposition of the equity power of this

court, the court's findings of fact and conclusions of law being:

### Findings of Fact:

1. The defendant, Southern Bell Telephone and Telegraph Company, Inc., is a public utility.

2. The defendant believed that the telephone equipment by it furnished to the plaintiff J. J. Fogarty, was actually being used by him for illegal purposes, and against the public policy of both the United States of America and the State of Louisiana.

3. It justified the threatened discontinuance of the plaintiff's telephone service by reason of said belief.

### Conclusions of Law:

1. Even in the face of plaintiff's charged unconstitutionality of Act No. 13 of the 1934 2nd Extraordinary Session of the Louisiana Legislature, the defendant company could rely upon every possible legal presumption in favor of the statute's validity (Union Pacific R. Co. v. United States, 99 U.S. 700, 718, 25 L.Ed. 496, 498, 501) in determining whether or not it, as a public utility, could justify its discontinuance of plaintiff's telephone service under the state of facts confronting it.

2. The defendant company, in so determining, could also consider the fact that were such act unconstitutional (as contended for by plaintiff), then the former Act No. 26 of the 1934 1st Extraordinary Session of the Louisiana Legislature which said Legislature intended to amend and re-enact by the attempted enactment of the amendatory Act No. 13 aforementioned, still subsisted and its terms provided that it was " * * * unlawful for any person or persons, firm, or corporation whatsoever to distribute, disseminate, make known, advise, or spread, or otherwise, by means of telephone, telegraph, radio, or in any other manner make known to pool rooms, bar rooms, saloons, restaurants, gambling houses, or any other place outside the enclosure of a licensed race track, any information of whatever kind, pertaining to any race, race track, race horse, betting or betting odds, form charts, or any information relative or incidental thereto."

3. The defendant company in so determining, could also consider the provisions of Act No. 127 of the 1920 Session of the Louisiana Legislature, the constitutionality of which was upheld by the Supreme Court of Louisiana in the case of State v. Mustachia, 152 La. 821, 94 So. 408.

4. The defendant company, in so determining, could also consider the warning that it received from the United States Attorney General's office, relative to the probability of defendant's being made to face criminal proceedings if the Fogarty phone service were not discontinued.

5. Defendant was legally justified (under the facts which were known to it at the time that it notified plaintiff of the contemplated discontinuance of his telephone service) in believing that its continued furnishing of such service was, at least, contrary to the public policy of both the United States of America and the State of Louisiana, if not illegal.

6. Reasonable grounds still exist to justify the determination of the defendant company to no longer service the plaintiff's race-track news dissemination system, and the company should not be enjoined against putting its threat of discontinuance into effect.

7. Under the testimony and the evidence, the plaintiff is entitled to none of the relief which he seeks from this court, sitting as in equity, and his prayer must, therefore, be denied.

Judgment may, accordingly, be entered for the defendant company, as prayed for in its answer.