Plotnick, Appellant, v. Pennsylvania Public
Utility Commission et al.

Argued October 16, 1940.

Before KELLER, P. J., CUNNINGHAM,
BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Joseph Atlas,* for appellant.

*Harry H. Frank,* with him *Harry M. Showalter,* for
appellee.

*Benjamin O. Frick,* with him *William H. Lamb,* for intervener-appellee.

*Arthur W. A. Cowan,* amicus curiae, filed a brief under Rule 61.

OPINION BY KELLER, P. J., February 28, 1941:

The cases cited and relied on by the appellant would be very helpful to us if this were an appeal from appellant's conviction for gambling or for assisting and abetting in· pool-selling or bookmaking or if it were an appeal from an order for the confiscation and destruction of the 'scratch sheets' published and distributed by the appellant on the ground that they were gambling machines or devices. But they have little or no bearing on the question here involved, which is, Was the Public Utility Commission guilty of error in refusing to order the respondent, the Bell Telephone Company, to supply its facilities and furnish its telephone service to the appellant, in order that he might use them in furtherance of the publication, sale and distribution of his 'scratch sheets' which deal exclusively with horse racing at various tracks throughout the country and are prepared for and sold to persons who are engaged in, or are patrons or victims of, the illegal business of pool-selling or book-making, forms of gambling which are forbidden in this Commonwealth?

Even the appellant should be able to see the distinction between holding, on the one hand, that a telephone or telegraph appliance used to receive and furnish information, even in connection with a pool-selling or book-making establishment, is not of itself such a *gambling machine or device* that it can be confiscated and destroyed under the strict provisions of our criminal code, (*American T. & T. Co.'s Appeal,* 126 Pa. Superior Ct. 533, 191 A. 210), and, on the other, ordering a telephone or telegraph company to *install an appliance and furnish service* which it has reason to believe will be

used in furtherance of pool-selling or book-making, in violation of our laws against gambling. It is too obvious to need lengthy discussion.

The settled policy of this Commonwealth, as declared in its legislation, is opposed to gambling. The provisions against gambling in our Criminal Code of 1939, P. L. 872, (sections 603-606) go back to 1705 (Act of January 12, 1705, Chap. CXVII, sec. III, 2 Stat. at Large 187); and against lotteries (sections 601,602), to the Act of February 17, 1762, 1 Sm. L. 246. See discussion in *Com. v. Banks*, 98 Pa. Superior Ct. 432, 433. And the provision against pool-selling and book-making (sec. 607) is practically a re-enactment of the Act of May 22, 1895, P. L. 99 (No. 72). It can be seen therefore that our laws against gambling are not of a recent or ephemeral character, but represent the settled policy of the Commonwealth.

In further prevention of gambling, and especially of pool-selling and book-making, the General Assembly in 1938 made it unlawful for any telephone or telegraph company within the Commonwealth, knowingly to furnish any private wire used or intended for use in the dissemination of information in furtherance of gambling or for gambling purposes (Act of December 1, 1938, P. L. 111, as amended by Acts of May 25, 1939, P. L. 207 and June 24, 1939, P. L. 674). The title and preamble of this act and the definition of "private wire" contained in it clearly express the policy of the Commonwealth as opposed to the furnishing of telephonic and telegraphic wires, service and appliances for the purpose of disseminating information pertaining to horse-racing in furtherance of gambling and the operation of illegal book-making and pool-selling establishments.

The telephone company's refusal to supply the facilities and furnish the service, which the appellant asked the commission to compel it to furnish, was based on

its unwillingness to furnish telephone service which, it had reason to believe, would be used to disseminate information in furtherance of gambling or for gambling purposes, and in violation of statutes forbidding the same; this refusal being based on the desire and purpose of the company to cooperate with the police authorities in their campaign against pool-selling, bookmaking and other forms of gambling.

The duty resting upon the telephone company, as a public utility and a common carrier, to furnish its service and facilities to the public generally and without discrimination, is limited to *lawful* service and does not extend to the furnishing of service used or intended to be used in violation of law or to aid in an unlawful undertaking. See *Smith v. Western Union Telegraph Co.*, 84 Ky. 664, 2 S. W. 483, and *Western Union Telegraph Co. v. State*, 76 N. E. 100 (Ind.), where refusal to furnish telegraphic service to *bucket shops* was upheld; and *Godwin v. Carolina Tel. & Tel. Co.*, 136 N. C. 258, 48 S. E. 636, where refusal to install a telephone in a bawdy house was sustained.

Almost the same question as is here involved came before the District Court of the United States for the Northern District of Ohio in *Hamilton v. Western Union Telegraph Co.*, 34 Fed. Supp. 928, and the District Court of the United States for the Eastern District of Louisiana in *Fogarty v. Southern Bell Tel. & Tel. Co.*, 34 Fed. Supp. 251. In the former, a temporary order restraining the defendant from discontinuing telegraphic service and tape teleprinter service to the plaintiff which were used by him to furnish information with regard to betting odds and payments, entries, scratches and the running and results of horse races to certain book-making establishments, etc., was dissolved because they were used by him to encourage and promote gambling transactions. In the latter, such a temporary order restraining the discontinuance of telephone service and appliances to the plaintiff for use in the publication and

distribution of a 'race scratch sheet' giving like information pertaining to race tracks, race horses, betting odds, forms, charts, etc., was dissolved and the petition dismissed, because the defendant company was justified in believing such service would be used in furtherance of gambling, contrary to the laws of Louisiana.

See also, to the same effect, *People ex rel. Restmeyer v. New York Telephone Co.*, 159 N. Y. Supp. 369, 173 App. Div. 132; *People ex rel. Hiegel v. New York Telephone Co.*, 195 N. Y. Supp. 332, P. U. R. 1923 A. 463. A number of other cases along the same line, recently decided but unfortunately not reported, are set forth at some length in the briefs of the commission and the intervening appellee. It is not necessary to cite them in this opinion, but they can be referred to in the briefs, if an examination is desired. They fully support the position of the telephone company and the commission.

The only remaining question is, does the evidence in the record support the statements and findings of fact of the commission, which, in substance, were that the publication and distribution of these 'scratch sheets' are so related to and identified with the unlawful business of book-making and pool-selling as to make them adjuncts and aids thereto; and that the telephone service and facilities which the appellant seeks to compel the respondent and intervening appellee to furnish would be used in encouragement and furtherance of those unlawful practices? We are of opinion that it clearly does.

The evidence establishes that the telephone and teletype service which the appellant was refused would be used not only (1) to get the information from New York or other points required for publishing the 'scratch sheets', which are devoted exclusively to horse racing at race tracks throughout the country, and give the entries, odds, scratches, jockeys, position, etc., for every race at each track, and the recommended best bets; but also, (2) that by means of a code word, published in

the sheet, which is changed daily, the purchaser of a scratch sheet can satisfy the publisher that he is a purchaser and can then obtain from him by telephone, without further charge, the results of the races as they are run, by reference to the number of the horse in the scratch sheet, and information as to the pay-off.

The sheets are in no sense newspapers. They are confined to information as to horse-racing, and tips as to the betting on the horses, supplemented by telephone service as to the winners and the pay-off. They could be of no interest except to the proprietors and employees of book-making and pool-selling establishments and their patrons or persons interested in betting on them at such establishments. The telephone and teletype service is installed (1) to secure the information needed for the publication of the sheets and (2) to supply the results of the races to *purchasers of the sheets*. It would have no reason or excuse apart from the unlawful business of book-making and pool-selling.

The evidence also supports the following findings of fact and conclusion of the commission:

"The Commission finds that the 'bookies', persons who receive bets on horse races for [from?] those desiring to bet, conduct a substantial part of their business on the streets of Philadelphia by the use of 'scratch sheets' of the type and character the complainant proposes to publish and distribute. The 'scratch sheets' [are] used by 'bookies' to make it harder for the police to get evidence of the actual headquarters of those providing the means whereby the public gambles on horse races, [and] are important in placing bets ...... The record in this complaint leaves little doubt that the publication and distribution of 'scratch sheets' is definitely identified with 'book-making' as outlawed by the 'Penal Code' of this Commonwealth. That 'scratch sheets' are used by book-makers in connection with the registering and recording of bets on horse races is clearly established. Thus, the telephone facilities of the re-

spondent company when furnished to complainant would aid, abet, and provide the means whereby bookmakers and gamblers may be furnished information useful before making bets, and necessary before paying off winners ...... The publication and distribution of 'scratch sheets' and the telephone information furnished to buyers of 'scratch sheets', by the publisher and distributor is definitely and conclusively aligned with horse-race gambling in this Commonwealth. The respondent company was justified in concluding that from the nature of complainant's business the telephone facilities would be used, or might be used, in the furtherance of horse race betting which is contrary to law. By reason and by law, respondent company was justified in its refusal to furnish the complainant telephone service in connection with the operation of complainant's business, and the Commission will not direct the respondent company to provide such telephone service."

The assignments of error are overruled. The order of the commission is affirmed and the appeal is dismissed at the costs of the appellant.