Pennsylvania Publications, Inc., Appellant, *v.* Pennsylvania Public Utility Commission et al.

280

Argued November 12, 1942. Before KELLER, P. J., BALDRIGE, STADTFELD, RHODES and HIRT, JJ. (KENWORTHEY, J., absent).

*Arthur W. A. Cowan,* for appellant.

*Frederick L. Kiger,* with him *Harry M. Showalter, Herbert S. Leroy,* and *Claude T. Reno,* Attorney General, for appellee, Pennsylvania Public Utility Commission.

*E. Everett Mather, Jr.,* with him *William H. Lamb,* for intervening appellee, Bell Telephone Company.

OPINION BY KELLER, P. J., April 26, 1943:

This appeal was argued on November 12, 1942; but supplemental briefs and reply briefs and supplements to supplemental and reply briefs were filed as late as January 15, 1943, which extended the decision of the appeal and the writing of the opinion.

The appellant is Pennsylvania Publications, Inc., a corporation engaged in the publication of a pamphlet or sheet—eleven inches long by seventeen inches wide, folded vertically down the middle so as to make four pages, each eight and one-half by eleven inches, three columns to a page—called "WILLIAM ARMSTRONG Jockeys Scratches Daily Sports". It is commonly

known as a 'scratch sheet', and is devoted almost exclusively[1] to furnishing information about horse-racing at the various tracks throughout the country, giving the names of the horses, the respective jockeys, the weights carried, the scratches, the condition of the tracks, the betting odds, the post positions, and the publisher's choice of winners, place, etc., as well as other "handicappers' selections", and other matters supposed to be of interest to horse-race fans and bettors. It is a subsidiary of or successor to the William Armstrong Publishing Company, and is affiliated with Armstrong Racing Publications, Inc. (New York), and gives in its 'sheet' the 'William Armstrong number' immediately preceding the horse's name, indicating the order in which the horses will probably finish in every race run that day. We shall refer to all of them, including appellant, as 'Armstrong' or 'Armstrong Publications'.

Following the action of the Commission on a complaint filed by Abraham Plotnick against the Bell Telephone Company of Pennsylvania[2], hereinafter called Bell, the latter notified appellant on June 12, 1940 that as it construed the language of the report and order of the commission in that case it felt obliged to terminate the telephone and teletypewiter service which it was furnishing appellant, and would, therefore, discontinue the same at noon on July 22, 1940.

On July 23, 1940 appellant filed its complaint with the commission praying for an order on Bell to continue the telephone and teletypewriter service that it had been accustomed to furnish appellant.

---

[1] The copy attached to the complaint had no 'sport' news except horse-racing and only four small news items, totalling two and one-half inches, of one column width, out of one hundred and five such column inches.

[2] See *Plotnick v. Penna. P. U. Comm. et al.,* 143 Pa. Superior Ct. 550, 18 A. 2d 542.

An answer was filed by Bell and hearings were scheduled but were continued at complainant's request until after the decision of this court was filed in the *Plotnick* case on February 28, 1941. The hearings began on July 2, 1941 and over five hundred printed pages of testimony were taken and several hundred additional pages of exhibits were filed.

The commission on January 12, 1942 ordered the complaint dismissed, Commissioners Thorne and Morgal dissenting.

Complainant appealed to this court. We refused its application to make the appeal a supersedeas.

The present appeal is so related to the *Plotnick* case as to make reference to the facts in that case necessary.

Plotnick had been an employee of Armstrong in Philadelphia from 1924 to July 14, 1940. He had formerly published in Philadelphia a similar sheet, known as 'Burns' Track Bulletin', which was consolidated with Armstrong's in 1924, when the latter began its Philadelphia publication. Plotnick wanted to set up again in the same business on his own account, and in order to do so applied to Bell, the respondent and intervening appellee in this case, for like telephone and teletypewriter service as it was furnishing this appellant. Bell refused the application and Plotnick then filed his complaint with the commission praying for an order on Bell to compel the service. As Plotnick had not yet started his service—and would not do so unless he obtained the desired service from Bell—he used Armstrong's publications as examples of what he proposed to print and publish, and the case was heard and decided on the basis of the Armstrong publications—including this appellant's—and their general effect as aiding and abetting racetrack gambling and bookmakers carrying on that form of gambling.

We realize that this appellant was not a party to that proceeding and is not concluded by it as res

judicata. But we are not credulous enough to believe
that it knew nothing about it. It certainly had full
knowledge of it before the appeal in that case was
argued in this court—see 143 Pa. Superior Ct. 550; for
it asked and obtained a postponement[3] of the hearings
in the present case until this court decided the appeal
in that case, and it presented to this court on that ap-
peal a brief as amicus curiae—see page 552 of the re-
port—in which it argued for a reversal of the Plotnick
order.

Therefore, in affirming the order of the commission
in that appeal, which had dismissed Plotnick's com-
plaint, we upheld the commission in its findings and
conclusions that the 'scratch sheets', which the com-
plainant Plotnick had presented as the model of his
proposed activities, are generally used by book-makers
in connection with the registering and recording of
bets on horse-races; that bookies—persons who receive
bets on horse-races from those desiring to bet—conduct
a substantial part of their business on the streets of
Philadelphia by the use of 'scratch sheets' of that type
and character; that the telephone facilities of Bell,
when furnished to complainant, would aid and abet
book-makers and gamblers, by providing the means by
which they were furnished information *useful* before
making bets and *necessary* before paying off winners;
that the publication and distribution of 'scratch sheets'
and the telephone information furnished [free] to buy-
ers of 'scratch sheets' by the publishers and distribu-
tors is definitely aligned with horse-race gambling in
Pennsylvania and so related to it as to make them ad-
juncts and aids thereto. We approved the following

---

[3] Counsel for appellant in asking for a postponement of the
hearing until after the decision in the *Plotnick* appeal wrote the
commission, inter alia, "The decision in the Plotnick case will
be as to many important points *stare decisis* although not *res
adjudicata.*"

extract from the commission's report and order: "The respondent company was justified in concluding that from the nature of complainant's business the telephone facilities would be used, or might be used, in the furtherance of horse-race betting which is contrary to law. By reason and by law, respondent company was justified in its refusal to furnish the complainant telephone service in connection with the operation of complainant's business, and the Commission will not direct the respondent company to provide such telephone service."

The testimony in the present case closed on August 28, 1941. On January 12, 1942 the commission filed its report and order dismissing the complaint. The report contains fourteen printed pages and shows a careful consideration of the evidence. After reciting the introductory statements in this opinion in somewhat greater detail, the report described the telephone and teletypwriter service, which the respondent had notified complainant it proposed to discontinue, as follows: "There are installed on [complainant's] premises 40 individual telephone trunk lines proceeding from respondent's central exchange, each of which terminates at each of five 'order turrets' mounted on tables. At each 'order turret' seating space is provided for four telephone operators. By means of telephone equipment and switching facilities ...... each operator can plug into any of the 40 lines and answer calls terminating thereon, and it is thereby possible for 20 operators to conduct conversations simultaneously over any 20 of the 40 lines. The telephones have a main directory listing in the name of 'Pennsylvania Publications, Inc.'. They carry designations of the Locust Exchange and their numbers are in three groups, namely, Locust 3240 [which is the only number listed] to 3259, inclusive; Locust 3266 to 3271, inclusive; and Locust 3276 to 3289, inclusive. Each of these [three] groups is so arranged

that if the first number of any group is called and is busy, trunk hunting equipment in respondent's central office will automatically select an idle trunk line in that particular group for the completion of the call. A call, originating on a line in one group cannot be completed on a line in either of the other two groups. In addition to the 40 lines and five 'order turrets' above described, complainant has an individual message rate business line with a hand-set which has a main directory listing in the name of 'The William Armstrong Publishing Company, Inc.' and an additional listing under the name of 'Pennsylvania Publications'. This line carries a Rittenhouse [Exhange] designation and its number is 9863. There are also on the premises two teletype-writers which are connected with respondent's general teletypewriter exchange service."

The evidence in the record shows that since the discontinuance, in Philadelphia, by the appellant of the publications of National Racing Program and Daily Green Sheet, on February 20, 1940, twenty of these forty trunk lines—that is, all except the first group, Locust 3240 to 3259 inclusive—did not answer calls for racing information, given under appellant's advertised "Free Phone Service", but the lines were not given up or released. The testimony of Captain Ellis, of the Vice Squad of the Philadelphia Bureau of Police, as to the results obtained when he dialed any telephone number included in groups Locust 3266 to 3271 inclusive or Locust 3276 to 3289 inclusive—see pages 383a-389a and 418a-419a—is interesting to say the least. The reply was always, "You have the wrong number", or "Hello", followed by a cut-off. He evidently did not give the "open-sesame" necessary for a conversation. A check made for five months by Mr. Williams, district manager of the respondent in charge of relations between the company and subscribers in the downtown section of Philadelphia, showed that *outgoing* calls by the com-

plainant on Rittenhouse 9863 averaged 126 calls a month; and that *outgoing* calls on Locust 3240-3259 inclusive averaged 1.44 calls per month for each of the 20 lines. For Locust 3266 to 3271, there were 182 *outgoing* calls for six lines in five months or 6.07 calls per line per month; and for Locust 3276-3289, the *outgoing* calls for fourteen lines were 471 or 6.73 calls per line per month. The company had no facilities or equipment to check the volume of *incoming* calls; but it could check the volume of "busy's" in a particular group, and it found that from 9 A. M. July 10 to 9 A. M. July 11, there were 1718 "busy's"—that is, there were 1718 times when an incoming call could not be completed because *every one* of the 20 trunk lines were "busy" when the call was made; and a similar test made for the next 24 hours showed 2095 "busy's"—or 2095 incoming calls that could not be completed because every one of the 20 trunk lines were busy when the call was made. These were the lines that were devoted to *answering calls requesting information as to results of races.* "In furnishing the results of any race the number listed at the left of the horses's name on complainant's sheet is given but the name of the horse itself is never mentioned. For example, if a person calls desiring information as to the horses which finished first, second and third in the first race at Aqueduct, he might be told by complainant's telephone operator that they were 'one, five and three'. Unless an Armstrong sheet, published that day, is consulted, the information given by complainant's telephone operator would not disclose to the person making the call the names of winning horses." [Report of Commission].

The commission made the following additional findings: "While the exact use of each Armstrong sheet that is sold cannot be ascertained, the sheet is employed extensively by horse race bookmakers, i.e., those who receive bets on horses, in Philadelphia, in the con-

duct of their businesses. From the uncontradicted testimony of Captain Craig Ellis, head of the vice squad of the Philadelphia police, it appeared that for the past 10 years bookmakers have used Armstrong sheets, and that in the past several years practically every one of the numerous raids conducted by the Philadelphia vice squad on bookmakers and bookmaking establishments have revealed the use of complainant's publication. It is the practice of small bookmakers operating on the street or in cigar stores, taprooms and newsstands, to mark down their bets on Armstrong sheets and then use the Armstrong numbers appearing to the left of the name of the horse when he phones in those bets to his headquarters. Some 'bookies' are able to obviate the necessity of marking the sheets by memorizing the Armstrong numbers which they subsequently phone in. Large bookmaking establishments quartered in private offices have adopted the system of receiving bets on horses designated in terms of Armstrong numbers and marking them down on Armstrong scratch sheets together with results and prices paid. Payoffs by both large and small bookmakers are habitually made upon the basis of information received over the telephone from complainant's offices. Both marked and unmarked Armstrong sheets have been confiscated on numerous occasions by the Philadelphia vice squad from persons and establishments suspected of bookmaking. The use of Armstrong numbers to record bets renders it more difficult for the police to apprehend bookmakers than if the horse's name is recorded on a betting slip. It appears that the bookmaker's practice of using Armstrong sheets has been developed largely since the use of leased wires for gambling purposes has been prohibited by state and federal legislation. When such facilities were available it was customary for the bookmakers to post the information secured thereover and the number of their bets upon large sheets known as

'run-down sheets'. With the disappearance of the leased wires, the use of the 'run-down sheets' has given way to the use of complainant's publication, and the information formerly supplied by the leased wire is now obtained from complainant. If complainant's publication and telephone service were not available it would be necessary for bookmakers to establish new systems of operating their businesses at considerable expense of time and money. Upon the basis of the foregoing facts we find and determine that complainant's publication is adaptable for use, and is intended for use in the illegal business of bookmaking, and that it is in fact employed by bookmakers to aid and assist them in the conduct of their operations. We further find and determine that the telephone and teletypewriter service which complainant desires here from respondent would be used in the encouragement and furtherance of the bookmaking business, and we consequently conclude that it would be improper for us to compel respondent to render such service."

The commission further found: "The instant case is on all fours with *Plotnick v. Pa. P. U. C.*, supra, and the decision in that case controls here." After reciting the facts and findings in the Plotnick case, which were upheld by this court, the commission continued: "We can perceive no essential difference between the facts of this case and the facts of the Plotnick case. If anything, the instant record must be regarded as containing more complete and definite evidence justifying the telephone company's refusal to serve than did the record in the *Plotnick* case. Since Plotnick was not at the time actually engaged in publishing and distributing a scratch sheet, the use which would conceivably be made of his publication had to be determined by reference to the use made of other similar publications. In the instant case, however, the actual use of complainant's 'scratch sheet' is conclusively established and

complainant's business definitely linked with the operations of bookmakers and gamblers ...... In view of all the foregoing we conclude that respondent was justified in believing that its facilities installed on complainant's premises had been used, and would be used in the future, in the furtherance of the illegal business of bookmaking and gambling and it was, therefore, justified in refusing to continue to serve complainant. The complaint must accordingly be dismissed."

The appellant has filed twenty-six assignments of error. Those that are deserving of discussion may be grouped under three general heads: (1) The sufficiency of the testimony to support the order of the commission. (2) Does the order unreasonably discriminate against appellant? (3) Was Commissioner Beamish disqualified from sitting in the case and taking part in its decision?

The other assignments do not merit extended consideration. The Public Utility Law does not contemplate or provide for a jury trial on questions of fact except as to such matters as parties were entitled to a jury trial before the enactment of the Public Service Company Law (Act of July 26, 1913, P. L. 1374, as amended by Act of July 11, 1917, P. L. 808, and July 17, 1917, P. L. 1025) and the Public Utility Law. That is what is meant by section 1110. Article I, section 6 of the Constitution which provides, "Trial by jury shall be as heretofore, and the right thereof remain inviolate," was not intended to extend the right of trial by jury, but to preserve it as it existed at the foundation of the state government: Byers & Davis v. Com., 42 Pa. 89; Van Swartow v. Com., 24 Pa. 131, 133, 134. The legislature may withhold trial by jury from new judicial proceedings created by statute and clothed with no common-law jurisdiction: Emerick v. Harris, 1 Binney 416, 423; Rhines v. Clark, 51 Pa. 96. Section 1110 of the Public Utility Law restricts the right to trial by

jury in public utility cases to those cases "where such right is secured either by the Constitution of the Commonwealth or of the United States." Cf. our State Constitution, Art. XVI, sec. 8.

The appellant had no right unnecessarily and uselessly to swell the record in this case by demanding the issuance of subpoenas duces tecum requiring representatives of 22 newspapers published in ten Pennsylvania cities, which printed racing news, "to produce before the commission all books, papers and records showing communication service and facilities furnished them by the respondent; and all books, papers and records showing the sporting news published by the said newspapers, the manner thereof, and the hours at which the successive editions of the said newspapers are distributed to the newsstands and the public; and all editions of the said newspaper for the three Mondays next preceding the date of the hearing or such portions thereof as comprise the said newspapers' complete racing news service." It was stipulated at the hearing that racing news was printed in the Philadelphia newspapers, samples of them were produced, and testimony was received as to the points of likeness and difference between them and the Armstrong sheets. Nor did the commission err in refusing to permit the complainant to take the deposition of Frank Ortell (a turf newswriter) when he was prevented by business engagements in New York from appearing and testifying in rebuttal on the date fixed for the taking of his evidence. The commission had been most lenient in continuing the hearings at complainant's request and it was guilty of no abuse of discretion in refusing further continuance. Furthermore a reading of Mr. Ortell's affidavit as to what he proposed to testify by deposition, in rebuttal, shows that much of it was substantially a repetition of what he had testified to at the hearing at which he appeared as a witness for complainant. His

explanation of "Totalizators" used at race tracks where betting is permitted under state supervision and is a source of revenue to the State, would have little or no application to the gamblers who surreptitiously conduct their illegal bookmaking operations in Philadelphia, and may be termed the 'bucket shops' of horseracing.

We shall take up the three groups of assignments in the order above stated.

### (1) SUFFICIENCY OF THE EVIDENCE

In our opinion the testimony in the present case is more definite, convincing and satisfactory than the testimony in the Plotnick case, which we held to be sufficient. It is true that the complainant in this case produced much more evidence than Plotnick did, but the commission is the fact-finding body and there is substantial competent evidence to support its findings. In fact, we, too, would be inclined to give more weight to the testimony of the Philadelphia police officials, who have to deal with the gambling situation existing in that City, than to the testimony of newspaper writers from New York, who are members of the New York Turf Writers' Association, and who cover horse racing in New York, where betting at horse races is legal, one of whom frankly stated that he took "a different version than the law" (p. 160a).[4]

---

[4] It is interesting to note that even in New York State where pari-mutuel betting at horse races is permitted by law, License Commissioner Paul Moss of New York city recently issued an order banning the sale by newsstands of racing sheets and scratch sheets, among them the Armstrong publications, including the sheet in question, "William Armstrong Jockeys, Scratches, Daily Sports" and also the "National Racing Program" and "Daily Green Sheet", which, while discontinued in Philadelphia are still issued in New York. Armstrong brought a suit for a permanent injunction to restrain Commissioner Moss from barring the sale of its publications on newsstands, which was heard before Supreme Court Justice Peter Schmuck on

The testimony of Police Captain Ellis and Police Sergeant Ferguson in the present case was more positive, definite and convincing than the evidence of the police authorities in the *Plotnick* case and warranted the findings of fact of the commission before mentioned. The opinion in the *Plotnick* case (pp. 553-554) refers at length to the legislation in this State evidencing the settled policy of the Commonwealth against gambling and against the furnishing of telephonic and telegraphic facilities in furtherance of gambling and the operation of illegal bookmaking and pool-selling establishments. It need not be repeated here. And we also pointed out in that opinion (pp. 554-5) that the duty resting upon a telephone company, as a public utility and a common carrier, to furnish its service and facilities to the public generally and without discrimination is limited to *lawful* service and does not extend to the furnishing of service used or intended to be used in violation of law or to aid in an unlawful undertaking. See, inter alia, *Hamilton v. Western Union Telegraph Co.*, 34 Fed. Supp. 928, 118 Fed. 2d 902; *Fogarty v. Southern Bell T. & T. Co.*, 34 Fed. Supp. 251; *Smith v. Western Union Tel. Co.*, 84 Ky. 664, 2 S.W. 483; *Western Union Tel. Co. v. State*, 76 N.E. 100 (Ind.) ; *Godwin v. Carolina T. & T. Co.*, 136 N.C. 258, 48 S.E. 636; *People ex rel. Restmeyer v. New York Tel. Co.*, 159 N. Y. Supp. 369, 173 App. Div. 132; *People ex rel. Hiegel v. New York Tel. Co.*, 195 N. Y. Supp. 332; and also, *Haggerty v. Southern Bell T. & T. Co.*, 145 Fla. 54, 199 So. 570; *Howard Sports Daily v. Weller*, 18 A. 2d 210 (Md. 1941).

---

January 20, 1943, but has not yet been decided. We mention the fact, not as having any influence on our action, but only to show that even in New York where *betting at horse races* is legal, the municipal authorities apparently had reason to believe that such publications catered to and aided and abetted bookmaking and poolroom gambling, which are not legal.

Even in some states where betting at horse races is permitted, bookmaking and pool-selling away from the tracks is illegal; betting being allowed where it is merely an adjunct to the thrilling spectacle of the horse race, but prohibited away from the race track where it is nothing but gambling.

## (2) DISCRIMINATION

Complainant contends that the order of the commission unreasonably discriminates between it and "other" newspapers which print racing news. We pointed out, however, in the Plotnick opinion that these racing sheets—including Armstrong's—are in no proper sense "newspapers". They are confined to giving information as to horse races and to tips or 'selections' intended for betting on horses, supplemented by telephone service as to the winners and the pay-off.

The newspapers referred to by complainants are bona fide newspapers which carry racing news as a part of their sport news, all of which is insignificant as compared to the general and local news printed.

While the betting public in this State may obtain information helpful to them from these newspapers, that is not the primary purpose of their publication, and the papers would no doubt exist and carry on if all horse racing were banned and discontinued. To discriminate between such newspapers and complainant's 'sheet' in the furnishing of telephone service, is not, in the light of the findings in this case, either unreasonable or unlawful. See *Howard Sports Daily v. Weller*, 18 A. 2d 210, 214.

While complainant's 'sheet' is stated in its publication notice as being entered at the New York post office —not the Philadelphia office, it will be noted—by Armstrong Racing Publications, Inc.,—not Pennsylvania Publications, Inc.—as second-class matter, under the

Act of Congress of March 3, 1879,[5] it was admitted at the hearing that in order to have it entered as second-class matter it had to certify to a *yearly subscription price*—which it fixed at $74—when, in fact, it had no such subscription price, had no *subscribers* at all, but sold its sheets only to newsstands which paid it eighteen cents per copy, for what they sell to the public at twenty-five cents per copy. The sheet is made up in New York and the front and back pages (pp. 1 and 4) are printed there; the type for the inside pages (pp. 2 and 3) are set in New York, but sent to Philadelphia to be run off on the press there, and the completed sheet is then issued in Philadelphia. Since the report and order in the *Plotnick* case, the Philadelphia 'sheet' has omitted the daily code or color word referred to in the Plotnick opinion, bottom of page 555 and top of page 556, by means of which the purchaser of the sheet could obtain by telephone the results of the races; but it is still retained in the New York edition. That the 'sheets' have apparently continued to thrive notwithstanding the discontinuance of the telephone service as to the results of races since February 27, 1942, when we refused the petition for supersedeas, proves nothing more than that the bookmakers have, perhaps, established a new system of operating their business, which the law enforcing authorities have not yet discovered. The *present* argument of complainant that such telephone service is not really *necessary* for the conduct of its business is diametrically opposed to its averments in its bill in equity to enjoin the discontinuance of the telephone service until the completion of the proceedings before the Public Utility Commission and in the

---

[5] The Act of March 3, 1879, ch. 180, 20 Stat. 359, 39 U. S. Code, §§224, 225, 226, sets forth the conditions under which second-class mail may be issued. Among them is, "It must be originated and published for the dissemination of information of a public character or devoted to literature, the sciences, arts, or some special industry, and *having a legitimate list of subscribers*". §226(4).

petition to this court for a supersedeas, filed February 13, 1942, wherein it averred, "Unless this Honorable Court grants the within petition for supersedeas your petitioner will be utterly without remedy and its business will be irreparably damaged and destroyed, and any appeal thereafter will be fruitless and a nullity, availing the petitioner nothing."

(3.) DISQUALIFICATION OF COMMISSIONER

The record, as to this feature of the case, was unnecessarily and unreasonably enlarged by a lot of irrelevant material introduced by complainant.

At the first hearing, which occurred on July 2, 1941, complainant's counsel objected to the sitting commissioner, Mr. Beamish, taking part in the proceedings, alleging that he was disqualified by reason of bias and prejudice against complainant. The manner of presenting the objection was not such as probably would have been used in urging a similar objection against a judge, sitting in court. Mr. Beamish denied any such disqualification, but withdrew as the sitting commissioner; however, he took part in the subsequent deliberations in the case by the commission.

We have gone carefully over the record, in this respect, and do not find in it any such clear and convincing evidence of bias or prejudice against complainant, or prejudgment of the case, as would disqualify Mr. Beamish from taking part in the deliberations and decision of the commission.

It is not alleged that he was disqualified by reason of personal financial interest. See *Tumey v. Ohio,* 273 U. S. 510. So that is out of the case.

Mr. Beamish was not, in our opinion, disqualified from sitting because he was a member of the commission which decided the *Plotnick* case. The fact that Plotnick presented the Armstrong publications as models or examples of the 'sheet' he proposed to publish, and that, in consequence, the use of their publi-

cations in furtherance of bookmaking activities became involved, did not disqualify the members of the commission from passing on the present complaint when it came before them: *Craven v. United States*, 22 Fed. 2d 605, 607 (C. C. A. 1). Otherwise, the complaint could not be heard at all, for all five members of the commission who took part in the present case also sat in and decided the *Plotnick* case. Complainant undertook to satisfy the commission that essential differences existed in the present case which had not been brought out in the Plotnick hearing and succeeded in convincing two members of the commission, but not the necessary majority.

It was shown by one of complainant's own witnesses that Mr. Beamish expressed no personal antagonism or hostility to Armstrong or the Armstrong publications. He was strenuously opposed to bookmaking and pool-selling operations carried on in this State contrary to law; but that does not disqualify him from sitting in a case involving a complaint against the discontinuance of an alleged legal service. The newspaper articles, based on alleged interviews with Mr. Beamish, offered in evidence as the foundation for the charge of bias, prejudice, etc., were instances of his militant opposition to bookmaking and pool-selling gambling, but did not establish bias or prejudice against this complainant, such as to disqualify the commissioner from sitting in the case. "The words 'bias' and 'prejudice' as used in the law on the subject under consideration, refer to the mental attitude or disposition of the judge towards a party to the litigation, and not to any views that he may entertain regarding the subject matter involved." 15 R.C.L. — Judges — sec. 18, p. 530.

The commission's order in this case was filed January 12, 1942. The newspaper articles, prior to that date, relied upon by complainant as showing Mr.

Beamish's bias and prejudice, were published October 18, 1939, and December 16, 1939 (714a), before Plotnick filed his complaint, and October 10 and 11, 1940 (607a-611a), about three months after the order in that case was made. The article of October 18, 1939 is not printed in the record as an exhibit; but the other four exhibits do not mention Armstrong's name. They show Mr. Beamish's militant antagonism to illegal bookmaking and similar forms of gambling.

A member of an administrative body or board, which acts as the agent or representative of the legislature in determining facts, may be required, as a part of his duties, to function in a quasi-judicial capacity as well. The due process required in such proceedings, however, is not synonymous with judicial process: *Com. v. Cronin,* 336 Pa. 469, 473, 9 A. 2d 408. The parties have a right to a fair hearing before an impartial board or body, and a determination free of bias, hostility and prejudgment. But bias in the form of a firm belief in the objectives of a statute, which the official is given power to enforce, rather than in the form of personal hostility, is not such bias as disqualifies. And where the legislature has not seen fit to separate the functions of the administrative body, it must be assumed that it did not intend that a reasonable bias in favor of the enforcement of the law should subject the official to disqualification.

The most conspicuous example that has come to our attention in this respect is *United States v. Morgan,* 313 U. S. 409, where the Supreme Court of the United States reversed the District Court of the United States for the Western District of Missouri for holding, inter alia, that the Secretary of Agriculture (Henry A. Wallace) was not an impartial trier of the facts, based on a letter written by him to the *New York Times* following the second decision in the proceeding, reported in 304 U. S. 1. Commenting on this, Mr. Jus-

tice Frankfurter, speaking for the Court, said: "That he not merely held, but expressed, strong views on matters believed by him to have been in issue, did not unfit him for exercising his duty in subsequent proceedings ordered by this court. As well might it be argued that the judges below, who had three times heard this case, had disqualifying convictions. In publicly criticizing this Court's opinion the Secretary merely indulged in a practice familiar in the long history of Anglo-American litigation, whereby unsuccessful litigants and lawyers give vent to their disappointment in tavern or press. Cabinet officers charged by Congress with adjudicatory functions are not assumed to be flabby creatures any more than judges are. Both may have an underlying philosophy in approaching a specific case. But both are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances. Nothing in this record disturbs such an assumption."

See also, *Craven v. United States*, 22 Fed. 2d 605 (C.C.A.1); *Crawford's Est.*, 307 Pa. 102, 160 A. 585; *Askounes' Liquor License Case*, 144 Pa. Superior Ct. 293, 19 A. 2d 846; *Natl. L.R.B. v. Tex-O-Kan Flour Mills Co.*, 122 Fed. 2d 433, 437 (C.C.A.5).

Appellant relies very strongly on the case of *Berkshire Employees Assn. v. Natl. L.R.B.*, 121 Fed. 2d 235 (C.C.A.3), but in that case the member of the Board, who was held disqualified from sitting, had written to a customer of the Berkshire Company a letter which was capable of the interpretation that he was actively endeavoring to assist in a boycott on Berkshire's goods, at a time when he was called upon, in his capacity as a board member, to pass upon questions concerning alleged unfair labor practices of Berkshire. As Judge Goodrich said, p. 239: "It goes far beyond a general predilection for or against labor organizations in gen-

eral or one in particular. It is comparable to the situation of a lawyer who has represented a client in an endeavor to get a settlement of a claim and before the claim is settled, is appointed to the bench and sits in the very case as judge."

On its facts, that case went far beyond this one.

The same court in the case of *Natl. L.R.B. v. Baldwin Locomotive Works,* 128 Fed. 2d 39, in answering the contention that the Board was biased and prejudiced, (based on speeches and newspaper releases by individual members), distinguished the Berkshire case, and speaking through Judge JONES, said: "It is now urged by the respondent that the Board was biased and prejudiced just as the stricken paragraph of the answer had alleged. To support the charge the respondent relies on articles written and speeches made by members of the Labor Board. But nowhere is there an allegation showing that either the Board or any member thereof ever acted *in respect of the subject matter of the instant complaint* other than officially and directly. The case of *Berkshire Employees Assn., etc. v. National Labor Relations Board,* 3 Cir., 121 Fed. 2d 235 is not in point; and the current charge of bias and prejudice stands unsustained." (p. 46 — italics supplied).

Furthermore, appellant has overlooked one very important point, and that is, that if Commissioner BEAMISH had taken no part in the decision of the case, and the vote had been two to two, the complaint could not have been sustained but would have to have been dismissed. To uphold appellant's complaint and secure action requiring Bell to continue the service it had notified appellant it would discontinue, a majority of the commission had to vote in favor of sustaining the complaint. Where a court or administrative body is asked to take action, a tie vote is equivalent to a refusal of the action. If a new trial is asked for, a tie

vote amounts to a refusal of the motion. If an appeal is taken, it amounts to an affirmance of the judgment: *Etting v. United States Bank*, 11 Wheaton (U.S.) 59, 78; *Griel's Est.*, 171 Pa. 412, 416, 417, 33 A. 375; *Clark v. Alcoholic Beverage Comm.*, 170 A. 79, 81 (R. I.). In the present case a tie vote would have amounted to a dismissal of the complaint.

The order of the commission is affirmed and the appeal is dismissed at the costs of the appellant.

Judge KENWORTHEY took no part in the consideration or decision of this case.