Pennsylvania Publications, Inc., Appellant, *v.* Pennsylvania Public Utility Commission et al.

Argued January 13, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

*Lemuel B. Schofield,* with him *W. Bradley Ward* and *Arthur W. A. Cowan,* for appellant.

*Harold A. Scragg,* with him *Frederick L. Kiger,* and *James H. Duff,* Attorney General, for appellee.

*E. Everett Mather, Jr.,* with him *William H. Lamb,* for intervenor, Bell Telephone Co.

OPINION BY MR. JUSTICE DREW, April 11, 1944:

These appeals * of Pennsylvania Publications, Inc., are from a judgment of the Superior Court, which affirmed an order of the Pennsylvania Public Utility Commission dismissing a complaint filed against The Bell Telephone Company of Pennsylvania.

---

* We deem it expedient to overlook the fact that the appeal at No. 204 January Term, 1943, was taken without special allowance of this Court (which under our decisions is improper: *In re Melon Street,* 182 Pa. 397, 38 A. 482; *Boyle's License,* 190 Pa. 577, 42 A. 1117), since the appeal at No. 239 January Term, 1943, was taken from the same judgment pursuant to the order of June 30, 1943, of this Court, allowing an appeal, and under our order of August 20, 1943, both appeals were consolidated and argued together.

186

One Abraham Plotnik, desiring to set up in his own behalf a business of publishing and distributing a daily paper or pamphlet devoted primarily to horse racing, similar to that of his former employer, this appellant, filed a complaint with the commission, alleging, inter alia, that the telephone company refused to render the necessary service to him and that such refusal was discriminatory. He presented copies of appellant's publication as the model of his proposed activities. After hearing, the commission, on July 8, 1940, found that the refusal to provide telephone and teletypewriter service was justifiable, for the paper Plotnik contemplated publishing and distributing was a "scratch sheet" such as generally used by bookmakers in connection with the registering and recording of bets on horse races and that the facilities of the telephone company, if furnished to him, would be used, or might be used, in furtherance of horse race betting, which is contrary to the law of this Commonwealth. On appeal, the learned Superior Court affirmed the action of the commission: *Plotnik v. Pa. P.U.C.*, 143 Pa. Superior Ct. 550, 18 A. 2d 542.

Four days after the commission dismissed Plotnik's complaint, the telephone company notified appellant, Pennsylvania Publications, Inc., by letter that it must terminate at noon on July 22, 1940, all telephone and teletypewriter service which was being furnished to appellant, because of the report and order entered by the commission in the Plotnik case. On July 23, 1940, appellant filed its complaint with the commission, praying for an order on the telephone company to continue the service that it had been furnishing to appellant. Later an injunction was granted in the court of common pleas to prevent the threatened removal of service. After a number of hearings and the taking of much testimony, the commission ordered the complaint dismissed. The commission reached its conclusion by a three to two majority, after one of the five commissioners, upon objection of counsel for appellant that he was disqualified by reason of bias and prejudice against appellant, withdrew

from taking part in the deliberations and decision of the commission. But, after the remaining commissioners voted two to two, the withdrawing commissioner appeared and cast the deciding vote. The Superior Court, on appeal, affirmed the order of the commission and dismissed the appeal: *Pa. Publications, Inc. v. Pa. P.U.C.*, 152 Pa. Superior Ct. 279, 32 A. 2d 40. The present appeals then followed.

This appellant and its predecessor have been engaged for many years in Pennsylvania in the business of publishing and distributing a paper called "WILLIAM ARMSTRONG, Jockeys, Scratches, Daily Sports", and have been using the facilities of the telephone company in connection therewith.

Pennsylvania Publications, Inc. is a Pennsylvania corporation, a subsidiary of or successor to the William Armstrong Publishing Company, and affiliated with the New York firm of Armstrong Racing Publications, Inc. The latter corporation maintains in New York City a racing library which is used not only by its handicappers and selectors, but also by the public and the Turf Writers Association—those interested in breeding and racing thoroughbred horses. Appellant's publication, which has no subscribers and is only sold from newsstands at the price of twenty-five cents a copy, is devoted almost exclusively to furnishing information regarding horse racing at the various tracks throughout the United States. It gives the names of the horses running, jockeys, post positions, weights which the horses carry, probable odds, scratches, condition of the tracks, and other data of interest to followers of horse racing. Practically all of this information is given daily on the sports page of every newspaper in the country. There also appears in appellant's paper, immediately preceding the name of each horse, what is called the "Armstrong Number". This number, according to the testimony, indicates the order in which appellant's experts believe the horses will finish. In the upper left hand corner of the inner page of the publication is printed the telephone numbers of

appellant in Philadelphia and Wilmington, under the caption "Armstrong's Free Phone Service".

The commission found, among other things, that: "The 'Free Phone Service' offered by complainant [appellant herein] in its publication is provided in Pennsylvania in the following manner: Any purchaser of an Armstrong Sheet may call the Philadelphia telephone numbers listed . . . and secure results of races already run and other racing information. It is for the purpose of disseminating such information that the teletypewriters and the 40 lines and five 'order turrets' connected therewith are maintained by complainants. Information as to race results is received by teletypewriter and is given to anyone who requests it. In furnishing the results of any race the number listed at the left of the horse's name on complainant's sheet is given but the name of the horse itself is never mentioned . . . While the exact use made of each Armstrong sheet that is sold cannot be ascertained, the sheet is employed extensively by horse-race bookmakers, i.e. those who receive bets on horses, in Philadelphia, in the conduct of their business. From the uncontradicted testimony of Captain Craig Ellis, head of the vice squad of the Philadelphia police, it appeared that for the past 10 years bookmakers have used Armstrong sheets, and that in the past several years practically every one of the numerous raids conducted by the Philadelphia vice squad on bookmakers and bookmaking establishments have revealed the use of complainant's publication."

The primary contention of appellant is that the evidence adduced is insufficient to support the order of the commission. It is well established that it is the duty of a telephone company to furnish service and facilities without discrimination in favor of or against anyone who will pay the applicable tariff rates and abide by the reasonable regulations of the utility: *Bell Teleph. Co. v. Commonwealth*, 2 Sadler 299; *Commercial U. Tel. Co. v. N.E. Telephone & Telegraph Co.*, 61 Vt. 241, 17 A. 1071; *Western Union Tel. Co. v. State*, 165 Ind. 492, 76 N. E.

100. This obligation, however, is limited to lawful service, for obviously to compel a public utility, under the guise of impartial regulation, to furnish service and facilities for purposes which are illegal would be contrary to public policy. Therefore, public service companies will not be compelled to furnish service to "bucket-shops" (*Western Union Tel. Co. v. State,* supra; *Smith v. Western Union Tel. Co.,* 84 Ky. 664, 2 S. W. 483) ; or to bawdy houses (*Godwin v. Carolina T. & T. Co.,* 136 N. C. 258, 48 S. E. 636) ; or to subscribers who use their telephones to receive and register bets on horse races in violation of law (*People ex rel. Restmeyer v. New York Telephone Co.,* 159 N. Y. S. 369, 173 App. Div. 132). However, such companies are not justified in refusing service to persons engaged in legitimate enterprises merely because such subscribers may furnish information over the facilities which may enable others receiving it to use the same illegally. In this connection it is stated in Wyman on Public Service Corporations, Vol. 1, §612, p. 500: ". . . it makes no difference to the right to service that illegal conduct may happen after the service is complete, provided that such conduct will be really independent of the service asked. Thus a railroad cannot excuse itself for failure to transport liquor by showing that the consignee may probably resell it in violation of the prohibition law. It is no excuse that a passenger may get into trouble upon her arrival at her destination, it being usual for her to get intoxicated there."

In the instant case, the appellant is engaged in a legal business. The publication of a newspaper featuring horse racing is not illegal. Horse racing is not prohibited by law in Pennsylvania, and there is nothing in our legislative history to indicate that it is contrary to public policy. Furthermore, there is nothing inherently wrongful in horse racing, and it is no more objectionable than baseball, football and other sports. Betting is not a necessary concomitant of horse racing. It is a well

known fact that many lovers of horses never place a bet on the result of a race, that while opposed to gambling they have a deep interest in developing and racing horses. Thousands upon thousands of people attend race meetings regularly for the enjoyment they get from the contests but have no interest in betting. A racing publication conveying information such as does the paper of appellant, though useful to the gambler in placing his wagers, is not a device or apparatus for gambling: *People v. Engeman,* 114 N. Y. S. 174, 129 App. Div. 462, affirmed, 195 N. Y. 591, 89 N. E. 1107. In holding that the Commissioner of Licenses of the City of New York had no legal power to ban the Armstrong publications and other similar papers, which do not print racing tips, but rather selections based on study, it recently was said in *Armstrong Racing Publications v. Moss,* 43 N. Y. S. 2d 171: "The court is not unmindful of the testimony of the police that invariably when arrests for 'bookmaking' . . . were made, a copy of one, several or all of the publications of these plaintiffs were found in the possession of the one arrested . . . In the light of the custom, usage, ethics and psychology of our community, it seems fairer to measure these publications in the same way as similar information in the general newspapers of the community is concerned."

The "Free Phone Service", which is the primary basis of the commission's order, does not come within the provisions of the Act of December 1, 1938, P. L. 111, as amended by the Acts of May 25, 1939, P. L. 207, and June 24, 1939, P. L. 674, which makes it unlawful for a utility knowingly to furnish a private wire for use in the dissemination of information in furtherance of gambling; nor is there anything in this record to indicate that the service sought by appellant is a subterfuge for such prohibited wire. The information given by appellant over its telephones was limited to furnishing of results of races according to the number assigned to the horse in the publication. There is no contention here that any other information was afforded. Appellant

did not make available fluctuating odds, which are absolutely essential to the gambler; nor did it receive or accept bets of any kind. "The furnishing or receiving of racing or sporting information is not gambling and is not a crime.": *American T. & T. Company's Appeal*, 126 Pa. Superior Ct. 533, 539, 191 A. 210. The record here is entirely barren of anything which would in any way cast doubt on the legitimacy of appellant's business. We are not so gullible as to suppose that the race results obtained over the telephone from appellant do not to some extent facilitate the paying off of bets, already placed, and no doubt are used for that purpose by bookmakers. Similarly, the publication by the newspapers of the country or the announcement over the radio of the results of baseball and football games, prize fights and other such activities may be an aid to gamblers, yet no one would seriously contend that the furnishing of such news was against the public policy of this Commonwealth, and therefore such newspapers and radio stations should be deprived of telephone or teletypewriter service.

*Fogarty v. Southern Bell Telephone & Telegraph Co.*, 34 F. Supp. 251 (Dist. Court, E. D. Louisiana), and *Hamilton v. Western Union Telegraph Co.*, 34 F. Supp. 928 (Dist. Court, N. D. Ohio, E. D.), cited and relied upon by appellee, are readily distinguishable on their facts from the instant case. In both those cases there was ample evidence to support the utilities' contention that they had reasonable grounds to suspect the illegality of the subscribers' business. Here there is absolutely no evidence to indicate that appellant was engaged in an unlawful enterprise. All that was here shown was that some recipients of the news distributed by appellant used or may have used it for an unlawful purpose. It would be just as absurd to contend that manufacturers of playing cards and dice were aiding and abetting gambling and should be denied telephone service because policemen found such objects when raids were made, as it is to argue that the appellant in the

instant controversy should be refused service because "in the past several years practically every one of the numerous raids conducted by the Philadelphia vice squad on bookmakers and bookmaking establishments have revealed the use of complainant's publication."

We fully agree with the following statement of Commissioner Thorne in the dissenting opinion filed by him in the instant case: "The majority find that the telephone and teletypewriter service of the complainant 'would be used' rather than could be used in the encouragement and furtherance of the book-making business, which, according to the majority, would use this service. This business exists not by reason of telephone service furnished by the respondent, but rather by failure of the law enforcement agencies to apprehend and put out of business such law violators. It is manifestly impractical for the Bell Telephone Company to seek out and discontinue service to every law violator, or to everyone who aids and abets in law violations within the Commonwealth of Pennsylvania, and such an order would impose an undue burden on the Bell Telephone Company. Consistent with the majority opinion, the respondent should immediately attempt to ascertain the names and cease furnishing service to everyone in any way connected with the publication or distribution of this sheet, such as the carrier who transports it from New York, those parties who distribute it to the news stands, the printer who prints the information contained therein, as well as the individual who might merely, out of curiosity, desire information such as is furnished by the complainant and who purchases a sheet and uses his own telephone to call for this information . . . Merely because someone happens to use this sheet illegally is no reason to deprive those who, for reasons which may be perfectly legitimate, also desire to use the service furnished by the complainant. And whether it be a 'scratch sheet', a newspaper, or any other publication furnishing information on horse racing which is conducted legally under the laws of the various states, no

right is conferred upon this Commission to usurp the police power of either the city of Philadelphia or any other municipality."

In *People v. Brophy*, 49 Cal. App. 2d 15, 33-34, 120 Pac. 2d 946, it was said: "Public Utilities and common carriers are not the censors of public or private morals, nor are they authorized or required to investigate or regulate the public or private conduct of those who seek service at their hands. . . . The telephone company has no more right to refuse its facilities to persons because of a belief that such persons will use such service to transmit information that may enable recipients thereof to violate the law than a railroad company would have to refuse to carry persons on its trains because those in charge of the train believed that the purpose of the persons so transported in going to a certain point was to commit an offense, or because the officers of such company were aware of the fact that the passengers were intent upon visiting a bookmaking establishment upon arrival at their destination, which establishment was maintained for the purpose of unlawfully receiving bets on horse races. Furthermore the furnishing or receiving of racing or sporting information is not gambling and is not a crime."

For these reasons, we are convinced, after a thorough study of this voluminous record, that the Bell Telephone Company failed to produce any evidence which could, by any stretch of the imagination, meet the burden cast upon it of justifying its depriving appellant of the telephone and teletypewriter service it had furnished for so many years. In this disposition of the case, it is unnecessary to consider and pass upon the other assignments of error filed by appellant.

Judgment of the Superior Court is reversed, and the record is remitted to the Pennsylvania Public Utility Commission to make and enter an order consistent with this opinion.