## Commonwealth v. The Armstrong Daily, Inc.

*Edward T. Baker, Deputy Attorney General,* and *William C. Sennett, Attorney General,* for Commonwealth.

*John W. Frommer, Dilworth, Paxson, Kalish, Kohn & Levy,* for defendant.

SHELLEY, J., December 16, 1968.—This matter is before us on exceptions to our opinion and order entered on March 11, 1968. The litigation came to us in the first instance on the appeal of The Armstrong Daily, Inc. (hereinafter referred to as Armstrong) under section 1104 of The Fiscal Code of April 9, 1929, P. L. 343, as amended, 72 PS §1104, from the refusal of the Board of Finance and Revenue (hereinafter referred to as the board) to resettle Armstrong's liability for franchise tax for the fiscal year beginning July 2, 1961 and ended June 30, 1962, under the Franchise Tax Act of June 1, 1889, P. L. 420, sec. 21(b), as amended, 72 PS §1871.

The salient facts are set forth in a stipulation of facts which is included in the record of the case.

Armstrong publishes, prints, sells and distributes a daily paper called The Armstrong Daily News Review.

Armstrong's executive offices, accounting and sales department, editorial and layout staff, circulation department and main printing facility are located at 250 West 30th Street, New York, New York. Armstrong's sole place of business in Pennsylvania is a rented facility at 2010 Sansom Street, Philadelphia, Pa.

"The Armstrong Daily News Review" consists of a single sheet of paper which, when folded in half, constitutes four tabloid size pages. The entire editorial and factual content and the layout of the paper is determined at the executive offices in New York City. Pages 1 and 4 (the outside pages) are printed in the main printing plant in New York and shipped in such partially finished state to Armstrong's local facilities in Philadelphia.

538

The content of pages 2 and 3 (the inside pages) is set up tentatively on printing racks or forms in New York and forwarded with the printed outside pages to its premises in Philadelphia. A specific number of partially completed papers is forwarded together with the printing racks, and the local premises must account for every one. On the morning of publication, the printing type forms are finalized based upon information sent from New York to reflect last minute changes. The paper, when folded with the material printed in Philadelphia on the inside, is specially crimped so that it cannot be opened without detection, and opened papers must be paid for by the distributors.

The employes of Armstrong attached to its Pennsylvania place of business during the fiscal year in question consisted of a manager and secretary, pressmen, routemen and several telephone girls who give free race results.

The routemen are part time weekly employes whose job is to drop off bundles in their own cars at prescribed stores and newsstands and pick up returns and receipts and bring them back to the premises on Sansom Street. A routeman is on straight salary, without commission.

A typical day's operation in the Pennsylvania premises in the tax year in question proceeds as follows: Shortly after 7 a.m., the outside pages of the paper (cover) and the plates for the inside pages are received from New York; from 7:30 a.m. to 8 a.m. pressmen set up the press; from 8 a.m. to 9 a.m. additional data, late scratches, names of jockeys and other information is taken off the teletype service from New York and the printing plates are changed; from 9 a.m. to 10 a.m. the press run takes place; shortly after 10:00 a.m. routemen arrive, pick up their assigned bundles for their routes as the papers come off the press and leave to cover their routes; at each location the routeman

drops off the daily quota, picks up returns and receipts from the day before, marks them on a daily report and brings the returns, cash and report back to the office; aside from outlying routes, routemen are normally finished by 11 a.m. and the average time spent by any employe is two to three and one-half hours a day; sales to more distant accounts are shipped by appropriate carrier, normally express bus or train, in numbers prescribed by New York.

The routemen's daily reports are consolidated on an office daily report and forwarded to New York. A copy of the office report is kept in the Philadelphia premises. The routemen's returned papers are initialed, bundled and forwarded uncounted to New York along with the office report, where they are checked for accuracy as to number and to detect used copies if the special crimped edges are opened. Any shortages, overages and used copies are charged back later to the routemen.

The office report summarizes the individual routeman's reports plus the total of the accounts shipped by carrier, any papers inadvertently damaged in printing, and any free copies. Moneys are deposited in a local bank on which only New York can draw.

The only tangible property held by Armstrong in Pennsylvania during the fiscal year in question consisted of a minor lead inventory at its Philadelphia premises. All other property used in Pennsylvania by Armstrong was rented. The value of the lead inventory for the fiscal year in question was $730.

For the fiscal year in question, the wages and salaries paid by Armstrong to its employes amounted to $84,536.07 which was composed of:

| | | |
|---|---|---|
| (a) | Pressmen | $ 9,323.66 |
| (b) | Routemen | 46,140.13 |
| (c) | Telephone operators | 18,102.25 |
| (d) | Manager | 7,830.00 |
| (e) | Clerical | 3,140.03 |

No personnel associated with the Philadelphia premises are paid a commission or bonus of any sort related to sales, or circulation, or new accounts. The sole activities of all Pennsylvania employes relate to printing, distributing and promoting The Armstrong Daily News Review.

The gross receipts of Armstrong from its Pennsylvania sales for the fiscal year in question amounted to $472,979 and were composed of:

Country sales .................... $235,954 [1]

Routemen's sales ................. $237,025

The total receipts of Armstrong from its Pennsylvania operations result solely from the sale of the paper, The Armstrong Daily News Review.

The resettlement of Armstrong's franchise tax for the fiscal year ended June 30, 1962, from which Armstrong appealed, was made in the following manner by the Board of Finance and Revenue:

$$\frac{730}{121,195} \quad \frac{84,536}{1,382,823} \quad x \quad 6,750,000 = \quad \$1,519.73$$
$$\frac{237,025}{3,489,254}$$

The thrust of Armstrong's appeal is that the board declined to allow a processing exemption contained in the Franchise Tax Act, as amended by section 1 of the Act of August 23, 1961, P.L. 1100, 72 PS §1871 p.p.

It was the position of the Commonwealth that Armstrong, in order to be granted the processing exemp-

---

[1] Completed papers forwarded by bus or train to distributors in outlying areas. These accounts are invoiced from New York and their returns are forwarded directly to New York.

tion, must demonstrate that it is either publishing a book, a newspaper, magazine or other periodical, or engaged in the business of printing within the Commonwealth and that Armstrong had failed to do so.

The Franchise Tax Act[2] provides that "every foreign corporation . . . from which a report is required under the twentieth section" of the act[3] "shall be subject to and pay into the treasury of the Commonwealth . . . a franchise tax . . . determined" by a formula contained in section 21 (b).

The exemption excludes from the numerators of the fractions contained in the formula the value of (1) taxpayer's tangible property, (2) expenditure of taxpayer for wages, salaries, commissions or other compensation to its employes, and (3) taxpayer's gross receipts from business attributable to the Commonwealth strictly incident or appurtenant to manufacturing, processing, research or development in this Commonwealth.

The Franchise Tax Act, supra, also provides in section 20 (c) (11) that:

"(c) The term processing as used in this section, shall mean and be limited to the following activities when engaged in as a business enterprise:

\*      \*      \*      \*      \*

(11) The publishing of books, newspapers, magazines or other periodicals, printing . . ." 72 PS §1871 (c) (11), section 21 of the Act of 1889, supra, P. L. 420, as amended.

The problem presented for our determination was whether or not Armstrong's activities in Pennsylvania are "processing" as that term is defined in the Franchise Tax Act.

---

[2] Act of June 1, 1889, P. L. 420, sec. 21, as amended, 72 PS §1871 (b).

[3] Act of 1889, supra, sec. 20, as amended, 72 PS §1901.

In our opinion we found that in order for Armstrong to qualify under the processing exemption, it had to be publishing a newspaper in Pennsylvania and its activities had to constitute processing. We held that it was publishing in Pennsylvania but that its product was not a newspaper and concluded Armstrong was not entitled to the processing exemption.

Our conclusion that Armstrong was not publishing a newspaper in Pennsylvania was determined to some extent by dictum found in the case of Pennsylvania Publications, Inc. v. Pennsylvania Public Utility Commission, 152 Pa. Superior Ct. 279 (1943), which referred to the product of the Pennsylvania Publications, Inc. as a "race scratch sheet". Our attention has been directed to the appeal by Pennsylvania Publications, Inc. to the Supreme Court of Pennsylvania reported in 349 Pa. 184 (1944) where, on page 189, the court said, "The publication of a newspaper featuring horse racing is not illegal".

The Commonwealth excepted to our finding that "as a factual and legal matter, [Armstrong] is engaged in publishing the Armstrong Daily News Review within the Commonwealth of Pennsylvania".

Armstrong filed numerous exceptions to our findings of fact and conclusions of law, only one of which will be considered. It would serve no useful purpose to include the other exceptions seriatim in this opinion.

The Commonwealth's exception is overruled for the reason set forth in the opinion referred to above. It would serve no useful purpose to reiterate what has already been said.

There is merit to Armstrong's contention that its publication is a newspaper and as such entitled to the processing exemption as allowed by the Franchise Tax Act, supra.

Armstrong comes within the general provisions of the taxing statute and has, therefore, the burden to

show that any exemption is applicable to its operation: Commonwealth v. Berlo Vending Company, 415 Pa. 101 (1964); Commonwealth v. Sitkin's Junk Co., 412 Pa. 132 (1963); Commonwealth v. Rudd-Melikian, Inc. 41 D. & C. 2d 425, 86 Dauph. 275, 279 (1966).

Even though an entity qualifies for the manufacturing-processing exemption, it does not mean that the entity is entirely free from tax. Under section 21(a) of the Act of 1889, supra, as amended, 72 PS §1871(a), we have, on many occasions, declared that certain assets were not directly used in manufacturing and, hence, were taxable: Commonwealth v. Prudential Industries, Inc., 80 Dauph. 381 (1963). Further, this court has created various formulae in order to consider cases where an asset was used both in an exempt and nonexempt activity: Commonwealth v. Louis Burk, Inc., 38 Dauph. 1 (1934); Commonwealth v. Philadelphia Toilet and Laundry Company, 339 Pa. 261 (1940). It is well established that once a taxpayer has carried its burden of proof in demonstrating that it is engaged in an exempt activity, there are still questions remaining which concern the use or function of specific assets. Further, the Franchise Tax Act, supra, limits the exemption from taxation to that property or those wages and salaries exclusively engaged in processing in this Commonwealth, and those gross receipts strictly incident or appurtenant to processing in this Commonwealth.

Applying the theory of partial exemption and the statutory language to the instant case, it would appear that the tangible property in Pennsylvania, being used as it is, would be excluded from taxation. However, as to the wages and salaries fraction, the pressmen, manager, clerical employes and routemen could be considered as being actively engaged in "processing". The telephone operators have no connection with the "processing" activities of Armstrong within the Common-

wealth.[4] Therefore, the taxable wages and salaries fraction would be

$$\frac{18,102.}{1,382,823}$$

As to the gross receipts, none of Armstrong's gross receipts arises from the business of printing. The gross receipts of Armstrong in Pennsylvania result solely from the sale of the paper, The Armstrong Daily News Review. Armstrong does not hold itself out as a printer to the general public and is, therefore, not engaged in the business of printing. At least one-half of the paper is printed or published in the Commonwealth. It would be a logical and proper solution if one-half of the gross receipts derived from the routemen's delivery in the amount of $237,025 should be exempt. This conclusion is in line with our determination in Commonwealth v. Louis Burk, Inc., supra, and Commonwealth v. Philadelphia Toilet and Laundry Company, supra, wherein a formula was developed to apply the exemption to assets used in both exempt and non-exempt activities. Applying this formula, the tangible gross receipts fraction would be

$$\frac{118,512.}{3,489,254}$$

Considering what we have said, we conclude that all exceptions of Armstrong inconsistent with this opinion must be overruled as is the exception of the Commonwealth.

Accordingly, we make the following

## ORDER

And now, December 16, 1968, all exceptions of Armstrong inconsistent with this opinion are overruled as is the exception of the Commonwealth. The Commonwealth is directed to recompute Armstrong's franchise tax for the year ended June 30, 1962, in accordance

---

[4] As we have heretofore indicated the telephone girls give free race results.

with this opinion and when so calculated, judgment will be entered for the Commonwealth in the amount so determined.